No. 84,171

D. Clarence Unrau, Louise Langenwalter, Mary Thiessen, F.C. Loganbill, and Esther Stuckey, *Plaintiffs/ Appellants/Cross-appellees*, v. Kidron Bethel Retirement Services, Inc., and Kidron Bethel Condominiums, Inc., *Defendants/Appellees/Cross-appellants*.

(27 P.3d 1)

744

Opinion filed July 13, 2001.

*Randall E. Fisher*, of Law Offices of Randall E. Fisher, of Newton, argued the cause and was on the briefs for appellants and cross-appellees.

*Susan R. Schrag*, of Morris, Laing, Evans, Brock & Kennedy, Chtd., of Wichita, argued the cause, and *Dennis M. Feeney*, of the same firm, and *David C. Burns*, of Sizemore, Burns & Gilmore, P.A., of Newton, were with her on the briefs for appellees and cross-appellants.

The opinion of the court was delivered by

LOCKETT, J.: Five condominium owners (Owners) brought an action against a condominium developer corporation and operator corporation seeking revision of condominium declarations, bylaws, and related documents. On appeal, Owners argue (1) that past acts of the illegally constituted board of directors of Kidron Bethel Condominium, Inc. (Association) were unlawful and invalid; (2) that persons who are not condominium owners cannot act as members of the board of directors; and (3) various other complaints decided by the district court which are discussed.

Developer corporation cross-appeals, claiming (1) the trial court erred in ordering a method of allocating votes different from the

Association's bylaws and (2) funding the project justifies a continuing exercise of developer control over the Association.

The entities involved are:

Village: Kidron Bethel Village, includes residential facilities (nursing home, HUD apartments, and condominium units owned by residents), nonresidential facilities, including health fitness center, kitchen, and dining rooms, arts/crafts facility, and chapel, and services, including access to nursing care at a discounted rate and transportation.

KBRS: Kidron Bethel Retirement Services, Inc., developer and manager, a non-profit corporation. KBRS planned and constructed the independent living housing and nursing home facility at the Village. KBRS owns and provides the noncondominium facilities and services of the Village.

Association: The Association, Kidron Bethel Condominiums, Inc., was incorporated on November 22, 1989. The Association is a nonprofit incorporated homeowners' association for the condominium development. Plaintiffs are members of the homeowners' association. Members of the association's board of directors are referred to in this opinion as the "Board."

Kidron, Inc.: Corporation formed in 1979 to develop and provide Housing and Urban Development (HUD) financed independent living units in the Village. Kidron, Inc., is not a defendant in this action.

Owners' petition alleged that KBRS and the elected Board were guilty of various breaches of fiduciary duties, including mishandling membership money, conversion, and other similar acts. Owners requested that the district court dissolve the Board, remove all control of the Association from KBRS, and reincorporate the Association in compliance with K.S.A. 58-3101 *et seq.* Owners further requested that KBRS be permanently enjoined from being involved with the Association and its operations and activities; to conduct an accounting to determine the actual losses sustained by the Association by reason of the breach of fiduciary duties of KBRS

and the Board; to conduct an accounting to determine the actual amount of unjust enrichment received by the defendants as a result of the breach of fiduciary duties; impose a constructive trust on the defendants until the Association can elect and install a new board of directors; order the defendants to convey possession and title of all the Association's assets to the newly elected board; order all assets of the Association to be held in constructive trust for the sole benefit of the Association; and order the defendants to pay the Association actual damages, attorney fees, and costs.

Many issues presented in this appeal require interpretation of the Kansas Apartment Ownership Act (Act), K.S.A. 58-3101 *et seq.* Other issues involve a review of the trial court's findings.

Throughout this opinion, the term "apartment owner" refers to the person or persons owning an apartment or condominium unit in fee simple absolute and an undivided interest in the fee simple estate of the common areas and facilities as specified and established in the declaration. K.S.A. 58-3102(b). Under the Act, each apartment owner is entitled to the exclusive ownership and possession of his or her apartment. K.S.A. 58-3105.

## Standards of Review

Interpretation of a statute is a question of law, and the Supreme Court's review is unlimited. *Hamilton v. State Farm Fire & Cas. Co.,* 263 Kan. 875, 879, 953 P.2d 1027 (1998). In construing statutes and determining legislative intent, several provisions of an act, *in pari materia,* must be construed together with a view of reconciling and bringing them into workable harmony, if possible. *State v. Bolin,* 266 Kan. 18, 24, 968 P.2d 1104 (1998) (citing *State v. Vega-Fuentes,* 264 Kan. 10, 14, 955 P.2d 1235 [1998]).

Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Sampson v. Sampson,* 267 Kan. 175, 181, 975 P.2d 1211 (1999).

### Acts of an Illegally Constituted Board of Directors

When developing the Village in the late 1980's, KBRS formed the condominium and housing project, drew up bylaws pursuant to K.S.A. 58-3118, created and recorded the Declaration of Kidron Bethel Condominium, a Condominium Development of Kidron Bethel Retirement Services, Inc. (declaration) pursuant to K.S.A. 58-3111 and K.S.A. 58-3115, and incorporated the Association to operate the condominium project. The declaration provided that each condominium owner was a Class A voting member of the association. Each Class A member had one vote. In the event of multiple ownership interests in a condominium unit, each fractional owner had a fractional vote corresponding to his or her ownership interest. KBRS was a Class B member. As a Class B member, under the declaration, KBRS was entitled to one vote for each condominium unit it owned and an additional three votes for each Class A vote.

The original Bylaws of Kidron Bethel Condominiums, Inc. (bylaws) provided that the Board should consist of nine directors. The condominium resident owners, as Class A members, elected two directors. KBRS, the Class B member, elected seven directors. Directors did not need to be resident owners but had to reside in Kansas. Subsequent revisions to the bylaws were made as the Village expanded. The number of directors increased. However, KBRS consistently exercised control over the Board by its weighted Class B voting power.

The district court initially ruled that the election scheme set out in the declaration and the bylaws for electing the Association's directors was legal under Kansas law. In its final order the trial judge reversed that decision, concluding:

"I don't know that I can point to any particular part of the Act, or a particular case that has caused me to change my mind. However, in reading the Act in its entirety and the legislative history behind it, I have come to the conclusion that the provisions of the Act can only be construed to be in harmony with each other and provide equitable management of a condominium association if it embraces the concept of election of the Board of Directors of the association by the condominium owners exclusively. I recognize that defendants have cited to the court numerous jurisdictions that have allowed developers to control condominium as-

sociations. However, none of those cases have allowed the developer to control the association indefinitely, and most of those jurisdictions have specific language in their condominium law that provides for developer control and the length of time it may be maintained. In my own research I have found no cases, and defendants have cited me to none, that have allowed developers to maintain control of an association in perpetuity. On the contrary, all of the cases I have studied require at one point or another for the developer to turn over control to the condominium owners.

"The Kansas Act provides no authority for control of the association by the developer. In fact, it appears that under K.S.A. 58-3119 that the Act contemplates that the Board of Directors of the association would come from the condominium owners themselves. I agree with the defendants that this section is permissive in nature and does not resolve the issue. However, I think the section gives us a strong indication that the Act contemplates that the affairs of the association will be controlled by the condominium owners themselves. In addition, K.S.A. 58-3102 defines "apartment owner" as follows:

"(b) 'apartment owner' means the person or persons owning an apartment or condominium unit in fee simple absolute and an undivided interest in the fee simple estate of the common areas and facilities as specified and established in the Declarations.

"And defines 'association of apartment owners' as follows:

"(d) 'association of apartment owners' means *all of the apartment or condominium unit owners acting as a group* in accordance with the bylaws and Declarations (emphasis added).

"The definition cited above, especially the definition of 'association of apartment owners' leads me to believe that in order for all of the owners to act 'as a group' the condominium owners must be in a position to exclusively elect their Board of Directors. Otherwise this language is meaningless.

"Even if the Kansas act could be construed as allowing KBRS to control the association for a reasonable period of time during initial development and marketing (as determined by the Massachusetts Court in *Barcley v. DeVeaue*, 329 N.E. 2d 323), that period has come and gone. Ten years [have] elapsed since the condominium program has begun in this case and the vast majority of the condominiums have been built and sold. I recognize that KBRS still owns many of the condominiums that they have repurchased. However, such ownership does not justify developer control for an indefinite time. Furthermore, KBRS is protected because it will have the same right to vote its ownership interest in the election of the Board, the same as the other condominium owners. Ultimately, KBRS will control the association because at some time in the future it will own a majority of the condominium units by way of its buy-back agreement it has with the present condominium owners through their residency agreements.

"I also note that throughout this litigation the defendants have argued strenuously to the court that the vast majority of the condominium owners support the past actions of the Board of [the Association]. Assuming that to be the case, I am

confident that the interest of KBRS will be protected by a new Board selected exclusively by those same condominium owners.

"The bottom line is I am changing my ruling and I am now finding the Kansas Apartment Ownership Act requires that the Board of Directors of [the Association] must be elected by the condominium owners exclusively. Anything in the Declarations or bylaws of [the Association] contrary to this ruling are declared null and void as of the date of this decision. All other terms of the Declarations and bylaws shall remain in full force and effect. To carry out this ruling I make the following orders:

"1. Each condominium unit will be entitled to one vote for each Board position in the election of a new Board of Directors for the association. In the case of a jointly owned unit, each owner shall be entitled to one-half vote on each Board position.

"2. KBRS shall have one vote for every condominium unit owned by it.

"3. I stand by my earlier ruling that a Board member does not necessarily have to be a condominium owner, provided all Board members are elected by the condominium owners exclusively.

"4. This ruling is prospective only, and not retroactive. Nothing contained in this ruling shall be construed as in any way invalidating any of the past acts of the present Board of Directors."

The order then instituted a procedure for electing and replacing the sitting board with a board elected only by the condominium owners. The court's order to reconstitute the Board was stayed pending appellate review.

The Owners agree that the trial court's ruling that the Association's Board of Directors was illegally elected in violation of the Act is correct; the Owners disagree with the court's decision not to invalidate the past acts of the Board. In the cross-appeal, KBRS and the Board argue that the judge erroneously ruled that the election of the Board by anyone other than the condominium owners violates the Act.

The statutory provisions for the composition and election of the board of directors of a condominium or association are K.S.A. 58-3102(b) and (d), which are quoted by the trial judge in his order. K.S.A. 58-3102(p) defines "person" as "individual, corporation, partnership, association, trustee or other legal entity."

The administration of every condominium property is governed by its bylaws. K.S.A. 58-3119 states, in part:

"The bylaws may provide for the following:

"(a) The election from among the apartment owners of a board of directors, the number of persons constituting the same, and that the terms of at least one-third (⅓) of the directors shall expire annually; the powers and duties of the board; the compensation, if any, of the directors; the method of removal from office of directors; and whether or not the board may engage the services of a manager or managing agent."

The apartment owners in this case are the individual condominium owners and KBRS, which has held fee simple title to various units from the project's inception. Although KBRS initially sold fee simple interests in the condominium units, it discontinued that practice and now sells life estates. Because KBRS no longer sells fee simple interests in the condominium units it has held or acquires by repurchasing units, it will ultimately become the owner of all condominium units in the Village.

The Boards of Directors of the three corporations that comprise the Village (KBRS, the Association, and Kidron, Inc.) are identical. Under the election scheme outlined in the declaration, the bylaws, and subsequent amendments to those documents, three directors are elected by the condominium owner/residents; four are appointed by four local Mennonite church congregations; three are elected by the financial contributors to KBRS; and three (known as community directors) are selected by the above 10 directors; the president of KBRS also serves in an ex-officio capacity. Although decisions regarding the operation and management of the Village are made by the Boards, the directors are not compensated for their services.

KBRS and the Board argue that because the Act does not prohibit developer control over a condominium project or require that only condominium residents elect a board of directors, the parties may contract as to the method of board election. They assert that because the parties contracted for the method of election in the Declaration and the bylaws, the courts cannot interfere with their agreement.

We note that in the absence of a specific statute, courts have placed numerous limitations on the control a subdivision developer may exercise over a property owners' association. For example, in *Barclay v. DeVeau*, 384 Mass. 676, 429 N.E.2d 323 (1981), unit

owners argued that a provision in the declaration of a condominium trust giving the developer three votes for each unit owned offended the Massachusetts condominium act. The applicable statute provided that "[e]ach unit owner shall have the same percentage interest in the corporation, trust or unincorporated association provided for in the master deed for the management and regulation of the condominium as his proportionate interest in the common areas and facilities." Mass. Gen. L. ch. 183A, § 10(a) (1980). In conflict with the statute, the condominium trust provided for developer control until the developer owned less than 12 units.

The *Barclay* court recognized that the developer and its mortgagee risk a great deal in undertaking a condominium project and, to protect their large investment, may need to maintain control of the project for a specific period of time. 384 Mass. at 683. However, the court recognized that an agreement designed to protect the developer's interests during the development and marketing phase of a condominium implicitly contains limitations of time on such protection. This view was consistent with the basic concept of a condominium, *i.e.*, that unit owners will be afforded a proportionate voice in the management of the common areas and facilities. 384 Mass. at 684.

The *Barclay* court held that the "marketing phase" of a condominium project was a reasonable period of time in which the developer may maintain control of the unit owners' association. It found that the marketing phase of the condominium is that time during which the developer actively engages in selling the condominium units. Allowing developer control during that period protects the developer's risk. 384 Mass. at 684-85.

In a footnote, the *Barclay* court noted that although the Massachusetts legislature had not adopted the portions of the Uniform Condominium Act dealing with developer control of a condominium association, the Act did present useful guidelines in determining the reasonableness of developer control in terms of time, percentage of interest owned, and marketing efforts. Specifically, the Uniform Act provides that regardless of the period provided in the declaration, a period of declarant control terminates no later than the earlier of 60 days after conveyance of 75 percent of the units

which may be created, 2 years after all declarants have ceased to offer units for sale, or 2 years after any development right to add new units was last exercised. 384 Mass. at 685, n.17 (citing Uniform Condominium Act, § 3-103[d]-[e], 7 U.L.A. 291 [1980]).

Because the *Barclay* case record did not clearly indicate what criteria the trial judge considered in determining that the condominium project was still in the marketing phase, nor did the record indicate whether the judge considered the question of reasonable time apart from marketing efforts, the appellate court remanded the case for a determination of whether the developer was actively engaged in a bona fide effort to sell units and if the circumstances required that control must pass to the unit owners.

In *Investors Ltd. v. Sun Mountain Condominiums*, 106 Idaho 855, 683 P.2d 891 (Ct. App. 1984), the developer filed a condominium declaration that contemplated the construction of three buildings, each containing four condominium units. After constructing one building, the developer sold out to Investors Limited. Investors Limited proposed that the declaration be amended to permit construction of a fourth building on the property.

All the units in the existing structures had been sold. A majority of the owners of existing units opposed the proposed amendment. Investors Limited argued that it owned eight authorized, although unconstructed units, and it was entitled to vote for each unit.

The *Investors Limited* court disagreed. The court pointed out that the declaration, although not entirely clear, seemed to define "owner" with reference to *physically existing* units. Pertinent to this case, the court noted that "[t]he declarant could easily have made clear specific provisions in the declaration for retaining some control in the Association until all or part of the units were completed and sold, if this was the intent." 106 Idaho at 857.

Here, developer control is maintained through class voting and each class of members votes as a separate unit. The Official Comment to the Uniform Condominium Act (UCA) recognizes that there are situations in which class voting serves a legitimate purpose, and the UCA permits such voting as provided in the declaration. U.C.A. § 2-107, Comment 9, 7 U.L.A. 252 (1997). However, units may not constitute a class simply because they are owned by

the declarant. U.C.A. § 2-107(c), 7 U.L.A. 250. Permissible unit distinctions must pertain to the characteristics of the unit rather than characteristics of the owner.

The Federal Housing Administration's proposed form, Declaration of Covenants, Conditions, and Restrictions, contemplates class voting as a device to enable the developer to control the project during its sales campaign. FHA Form 1401 (VA Form 26-8201) Art. III § 2. Developers following the prescriptions of this form divide unit owners into those comprising Class A membership (consisting of all unit owners except the developer) and those comprising Class B membership (the developer). Each Class A member has one vote per lot. The Class B member enjoys three votes per lot. To ensure that developer control is not perpetual, the developer automatically becomes a Class A member upon the earlier of (1) "when the total votes outstanding in the Class A membership equal the total votes outstanding in the Class B membership" or (2) a specified deadline date. Thus, the developer will remain in control of the subdivision until 75 percent of the lots are sold or until a deadline date. The contested voting scheme in *Barclay* was, as is in this case, similar to the class scheme provision in the FHA form.

The trial court's determinations that a reasonable period of marketing time had lapsed and that KBRS must relinquish its control of the Board are consistent with the concept of control proportionate to ownership interest. Here, as in *Barclay*, the bylaws and declarations are designed to protect the developers' interests during the development and marketing phase of a condominium and implicitly contain limitations of time on such a phase. In a well-reasoned opinion the trial judge concluded that, "ownership does not justify developer control for an indefinite time." The trial court determined correctly that the market phase had passed and ordered that the Board be reconstituted by election by the condominium owners in accordance with their ownership interest.

## Prospective Ruling

The Owners contend that the trial court's conclusion that the past acts of the Board were lawful and valid is inconsistent with its

determination that the Board was illegally elected. The ruling is not inconsistent. As noted previously, developer control over a board is not unlawful during the marketing phase of a condominium development.

The Board argues that the trial judge's ruling as to developer control of the Board should be prospective regardless of when the marketing/development phase of the project ended. The Board argues that this issue is subject to the analysis adopted in *In re Estate of McDowell*, 245 Kan. 278, 777 P.2d 826 (1989). There, the *McDowell* court held: "A judicial decision may be applied prospectively only if: (1) the decision establishes a new rule of law; (2) retroactive application would not further the principle on which the decision is based; and (3) retroactive application would cause substantial hardship or injustice." 245 Kan. 278, Syl. ¶ 2.

The Board also asserts that retroactive application of the ruling would not further the principle of owner control and would cause substantial hardship to other individual condominium owners. The Board points to the fact that many owners bought into the project and invested money with the expectation that special services and facilities, such as the Wellness Center, access to health services, and programs with Bethel College, would be available in the future. The Board argues that invalidating the past acts of the Board would reshape the community and frustrate the legitimate expectations of condominium owners. The Board also asserts that money the Owners paid cannot be traced because that money has long been combined with fees and reimbursements for health services, meals, and charitable contributions, and has not enriched any person. It also claims that invalidation of the prior Board decisions, which includes adoption of the bylaws, could expose individual members of the association to personal liability for the debts and liabilities of the association.

The Board argues that under basic corporate principles, the trial court's ruling that the sitting Board was illegally elected must be applied prospectively. The Board cites the de facto corporation doctrine for support. It argues that the Association's directors and officers are de facto directors and officers under Kansas law because they "assumed their duties as such under color of authority,

performed those duties, and were recognized and accepted as . . . officers [or directors] by all who dealt with them." See *Olathe Hospital Foundation, Inc. v. Extendicare, Inc.*, 217 Kan. 546, 558, 539 P.2d 1 (1975).

The de facto corporation doctrine is a legal makeshift by which unlawful or irregular corporate and public acts are legalized for certain purposes on the score of necessity. For the most part, the rule applies to third persons dealing with such officers. 2 Fletcher, Cyclopedia of the Law of Private Corporations § 372 (rev. perm. ed. 1998). An officer de facto has been defined by the courts as one who has the color of right or title to the office he or she exercises, or who has the apparent title of an officer de jure. 2 Fletcher, Cyclopedia of the Law of Private Corporations § 373 (rev. perm. ed. 1998). Generally, the contracts and acts of de facto officers, when acting within the scope of their authority, are just as binding as the acts of officers de jure, as least so far as third persons are concerned. 2 Fletcher, Cyclopedia of the Law of Private Corporations § 380 (rev. perm. ed. 1998). The validity of the acts of de facto directors or officers are not affected by the fact that a court declares the election or appointment void and ousts them from the office. Furthermore, so far as third persons are concerned, the rule that the acts of de facto officers are binding in their favor is ordinarily merely another way of stating that the corporation is bound. If a contract between de facto officers and third persons is binding on the latter, then it cannot be attacked by the corporation as the act of de facto officers. 2 Fletcher, Cyclopedia of the Law of Private Corporations § 383 (rev. perm. ed. 1998).

Here, since the Board was legally constituted at the inception of the development stage, the trial court correctly ruled that the prior acts of the Board were not void or illegal. Clearly, this establishes a new rule of law in Kansas and therefore must be applied prospectively.

## Composition of Board of Directors

The trial judge ruled that Board members are not required to be condominium owners, provided Board members are elected by the condominium owners. We agree.

K.S.A. 58-3119 provides:

"The bylaws may provide for the following:

"(a) The election from among the apartment owners of a board of directors, the number of persons constituting the same, and the terms of at least one-third (⅓) of the directors shall expire annually; the powers and duties of the board; the compensation, if any, of the directors; the method of removal from office of directors; and whether or not the board may engage the services of a manager or managing agent."

Neither the statute nor the Act, generally, restricts board membership to condominium residents. In fact, K.S.A. 58-3119 sets out a discretionary list of bylaw provisions that may govern the organizational structure of a condominium owners' association. The legislature's use of the language "may provide" in K.S.A. 58-3119(a) makes the provisions regarding the contents of the bylaws permissive and discretionary.

The trial court noted that, as a practical matter, requiring that the Board must be comprised of condominium residents could result in impediments to an organization comprised of retired persons who may not want to be involved in governing their association and who would choose not to serve on the Board. As the trial court stated: "We can foresee that associations will exist where none of the members will want to serve on the board. If this court finds that only residents may serve on an association's board, then these associations must fail for want of leadership."

### Owners Bound by Declarations and Bylaws

At the time several of the Owners signed their residence agreements, the declarations and bylaws had not been recorded. Noting that K.S.A. 58-3115 states that neither the declaration nor any amendment thereto shall be valid unless duly recorded, the Owners contend that the declarations are not binding on owners who signed their residency agreements prior to the filing of the declaration. KBRS filed the declaration before each plaintiff accepted the deed to his or her condominium unit. The accepted deeds provided:

"FOR GOOD AND VALUABLE CONSIDERATION, receipt of which is hereby acknowledged, Grantor hereby conveys and warrants to Grantee all of the

following described condominium unit together with its undivided interest in the common areas and facilities, located in the County of Harvey and State of Kansas:

"Unit . . . according to the Declaration of Condominium, dated September 11, 1989 and recorded September 12, 1989, . . . and all recorded amendments thereto, together with the undivided interest in common and limited common areas and facilities declared in the declaration to be appurtenant to such unit.

. . . .

"EXCEPT AND SUBJECT TO all restrictions, easements, conditions, covenants, reservations, liens and charges and the rights and powers created or reserved by said condominium declaration described above and the provisions of the Condominium Ownership Act of Kansas. All easements, rights, benefits and privileges of every character granted, created, reserved or declared by said declaration and all impositions and obligations imposed by said declaration shall be deemed and taken to be covenants running with the land and liens to the extent set forth in said declaration and the Condominium Ownership Act of Kansas."

As to the binding effect of the declarations and bylaws on such Owners, the trial court found:

"This court does not accept the claim of [certain] plaintiffs . . . that they are not bound by the Declarations because the Declarations were filed several days after they either signed their residency agreements or took their deed. In the residency agreements, KBRS agreed to convey to the plaintiffs good title to certain units. That was accomplished when, following the filing of Declarations, warranty deeds were delivered to the plaintiffs. The Declarations are specifically incorporated into and made a part of the respective deeds by which plaintiffs claim title to the condominium units. What plaintiffs received was the property described in the deed, which was clearly property described by and subject to the Declarations. By accepting their deeds, the plaintiffs rights to anything further or contrary that they might have been entitled to by virtue of their residency agreement was fully and finally extinguished. See *Palmer v. The Land and Power Company*, 172 Kan. 231[, 239 P.2d 960 (1952)]."

It is a general rule of law applicable to all contracts, including deeds, that prior stipulations and agreements are merged in the final and formal contract or deed executed by the parties. When a deed is delivered and accepted as performance of a contract to convey, the contract is presumed to be merged in the deed. An agreement for the conveyance of land is in its nature executory, and the acceptance of a deed in pursuance thereof is to be deemed prima facie an execution of the contract and the agreement thereby becomes void and of no further effect. *Palmer v. Land & Power Co.*, 172 Kan. 231, 237, 239 P.2d 960 (1952).

Because the deeds were delivered and accepted subsequent to the filing of the declaration and the deeds referenced the binding effect of the declaration, the deeds supercede the residency agreements. Under these circumstances, the Owners are bound by the declaration.

## Fiduciary Duty

The trial court did not make a specific finding concerning the existence of a fiduciary relationship between KBRS and the Owners. The Owners contend that the court's failure to find that the Board owed a fiduciary duty to the Owners resulted in the court applying an incorrect standard of proof to the various issues raised by the Owners.

The court stated in its letter decision:

"92. The court finds that from the beginning, except as herein noted, the Board acted in a careful and conscientious manner. The court can find no evidence of self-dealing, bad faith or other improper motives on the part of any Board member at any time. Board membership is not a paid position and no Board member realized any financial gain by virtue of his or her position on the Board. The Board consisted of qualified business and professional people who were donating their time and talents to the enterprise, as well as condominium residents.

"93. The court finds that the 'business judgment rule' applies in reviewing judgments by corporate Boards of Director. See *Richards v. Bryan*, 19 Kan. App. 2d 950. Except as herein noted, I find no violation of that rule.

"94. The court finds a complete absence of fraud, or [unconscionable] conduct on the part of [Association] board members at any time. The mistakes made and noted herein are found by me to have been honest mistakes made by the Board."

The Board contends that the trial court's findings concerning the good faith of the Board and its application of the "business-judgment rule" indicate that the trial court judged the actions of the Board under a fiduciary standard.

Business-judgment rule is defined as follows:

"The presumption that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest. The rule shields directors and officers from liability for unprofitable or harmful corporate transactions if the transactions were made in good faith, with due care, and within the directors' or officers' authority." Black's Law Dictionary 192 (7th ed. 1999).

The business-judgment rule is generally inapplicable to boards of property owners associations. Unlike a business corporate board, whose function is usually acquisition, a property owners association board is expected to protect and preserve property values. Conduct and judgments that would be permissible among business persons may be impermissible for officials of a property owners association. Natelson, Law of Property Owners Associations § 10.3.1 (1989).

Although the duty of good faith traditionally has been subsumed within the obligation of loyalty, the obligation of good faith cannot be treated as unique to or characteristic of fiduciaries because Kansas courts imply a duty of good faith and fair dealing in every contract. *Kansas Baptist Convention v. Mesa Operating Limited Partnership*, 253 Kan. 717, 725, 864 P.2d 204 (1993).

Before, during, and sometimes after the developer's sales campaign, a majority of an association's board of directors and most or all of its officers are developer nominees. Typical nominees include the principals of the development company itself, their spouses, company employees, and the company lawyer. Unit purchasers who are elected to official positions also incur certain responsibilities to the members. Standards of official duty may therefore be imposed upon three categories of persons or entities: (1) a unit purchaser elected to association office, (2) a development company and its nominees as corporate promoters, and (3) a development company and its nominees acting as a controlling shareholder. In property owners associations, the duties of good faith and diligence do not differ appreciably among the three categories of officials, but the duty of fiduciary responsibility generally falls to developer-appointed directors only. Natelson, Law of Property Owners Associations § 10.0.3.

Fiduciary duties are those imposed in order to prevent one in whom special trust or confidence is placed from representing his or her own interests over those of his or her charges. "Special trust" means a greater degree of confidence than might be found in an arm's length transaction. The goal of courts in imposing fiduciary duties is ensuring loyalty. To promote this goal, the courts require that a fiduciary act solely on behalf of its charge and that the fi-

duciary do so scrupulously and in good faith. Natelson, Law of Property Owners Associations § 10.4.

The Owners rely on *Kansas Baptist Convention*, 253 Kan. 717, and cases from various jurisdictions for support of their contention that, as a developer-controlled association, the Association owes a fiduciary duty of care to the Owners. See, *e.g.*, *Raven's Cove Townhomes, Inc. v. Knuppe Development Co.*, 114 Cal. App. 3d 783, 800-01, 171 Cal. Rptr. 334 (1981); *Cloud v. Association of Owners*, 857 P.2d 435, 439 (Colo. App. 1992); *Ocean Trail Unit Owners Ass'n v. Mead*, 650 So.2d 4, 7 (Fla. 1995); *Board of Managers of Weathersfield Condominium Ass'n v. Schaumburg Limited Partnership*, 307 Ill. App. 3d 614, 620, 622, 717 N.E.2d 429 (1999).

In *Raven's Cove*, the condominium owners' association brought an action for breach of fiduciary duty as a result of the failure of the association's initial board of directors to fund an adequate reserve account for contingencies. The developer in that case had paid the ordinary costs of maintenance until the association was turned over to the homeowners after the last unit was sold. The developer and its employees, who were the incorporating directors and initial officers, totally controlled the association until the last unit was sold. Until the turnover, all directors of the association were either owners or employees of the developer. No reserve or operating funds had been created when the developer turned over control to the homeowners. As a result, the homeowners had to vote a dues increase for operating costs. Because there were no funds available to be set aside for reserves, the condominium project suffered deterioration. The *Raven's Cove* court stated:

"Of particular significance is the conflict of interest presented where, as here, the owner of the Developer and his wife and major co-owner, are also directors of the Association in its infancy, along with the Developer's employees. We note that the duty of undivided loyalty [citation omitted] applies when the board of directors of the Association considers maintenance and repair contracts, the operating budget, creation of reserve and operating accounts, etc. Thus, a developer and his agents and employees who also serve as directors of an association, like the instant one, may not make decisions for the Association that benefit their own interests at the expense of the association and its members. [Citations omitted.] In most jurisdictions, the developer is a fiduciary acting on behalf of unknown

persons who will purchase and become members of the association [citations omitted].

"We also find persuasive the following comment on the specific problem here presented. '[I]ndividuals on the board are held to a high standard of conduct, the breach of which may subject each or all of them to individual liability . . . . Where a developer or sponsor totally dominates the association, or where the methods of control by the membership are weak or nonexistent, "closer judicial scrutiny may be felt appropriate," and the principles of fiduciary duty established with business corporations "may exist for holding those exercising actual control over the group's affairs to a duty not to use their power in such a way as to harm unnecessarily a substantial interest of a dominated faction.' " (12 Wake Forest L. Rev. 915, 923.) We are indebted for our approach to these problems to the thoughtful and insightful discussion of the specific issues in the Wake Forest Law Review cited above, which aptly continues at page 976: 'The subject of fiscal responsibilities, *e.g.*, "lowballing" failure to pay assessments on unsold units, the failure to enforce the obligation to pay, is one of the areas of great developer exposure.' The article also points to the necessity for good management—with adequate books, records and minutes. [Citation omitted.]" 114 Cal. App. 3d at 799-01.

The *Raven's Cove* court concluded:

"We think that here, the failure of the initial Association directors to exercise supervision which permits mismanagement or nonmanagement is an independent ground for the breach of fiduciary duty by the Developer during the initial period of the Association, when the Developer and its employees controlled the Association." 114 Cal. App. 3d at 800.

The *Raven's Cove* court held that the initial directors and officers of the Association had a fiduciary relationship to the homeowner members analogous to that of a corporate promoter to the shareholders. The court found that these duties take on a greater magnitude in view of the mandatory association membership required of the homeowner. 114 Cal. App. 3d at 800.

In *Cloud*, 857 P.2d 435, the defendants, condominium association members, contended that the developer, as a corporate officer of the condominium owners association, breached a fiduciary duty owed to the corporation. The *Cloud* court stated the standard which was applied to the issue: "Promoters of a corporation are in a fiduciary relationship to the corporation subsequently formed. [Citation omitted.] Corporate directors and officers are also fiduciaries of the corporation [Citation omitted.]" 857 P.2d at 439.

Here, the trial court applied the business-judgment rule and weighed the issues and transactions of the Board under the fiduciary standard of care. Any unfair transaction undertaken by one in a fiduciary relationship may result in liability for unjust enrichment of the fiduciary. Where the fairness of a fiduciary transaction is challenged, the burden of proof is upon the fiduciary to prove by clear and satisfactory evidence that such transaction was fair and done in good faith. *Newton v. Hornblower, Inc.*, 224 Kan. 506, Syl. ¶ 9, 582 P.2d 1136 (1978).

### Validity of Original Management Agreement and Subsequent Amendments

The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. *City of Topeka v. Watertower Place Dev. Group*, 265 Kan. 148, 152-53, 959 P.2d 894 (1998).

KBRS manages the Association under the terms of a management agreement, which was created on November 22, 1989, and was originally for a term of 10 years. The parties to the agreement are KBRS and the Association. The agreement is signed by Thomas C. Wentz, as President of both organizations. The management agreement was approved by action of both the KBRS and the Association's boards.

Paragraph 8 of the 1989 management agreement provides:

"Compensation. It is understood and agreed that the cost and expenses incurred by the Manager in the furnishing and providing the services which are the subject of this agreement may fluctuate from time to time and that the management fee shall be adjusted as hereinafter provided during the term of this agreement. Manager's fee for the period commencing April 1, 1989, and ending March 31, 1990, shall be $165.00 per month per apartment. In the event of any increase in the cost of living index during any year as herein defined, from this base or floor then and in such an event, the $165.00 monthly fee to the Manager shall be increased proportionately with the increase in the cost of living. The cost of living for the period from January 1 to December 31 of the [preceding] year as reflected by the "Wholesale Price Index for All Commodities" of the U.S. Department of Labor's Bureau Statistics, with the year 1989 as the base year and equal to 100 % shall be the base or floor."

Prior to November 6, 1990, the Owners' monthly fees were raised. The fees charged from November 1990 through December 1991 were $225 (single) and $285 (double). In November 6, 1990, in the minutes of a special meeting of the boards of KBRS, and Kidron Inc., state:

"The raising of the monthly fees of the Townhouse residents.

"Tom Wentz reported that the residents of the Townhouses have circulated a petition regarding the raising of the monthly fees and would like a description of the additional services, facilities and care that have been implemented recently to justify a raise of nearly 73% in their monthly fees. They feel as though the proposed raise is premature.

"Dom Schmidt reported that he has visited with several of the residents of the Townhouses about the increase in fees. Suggested that the residents should have been brought together to discuss the increase in a group meeting before implementing the increase. There are also other issues along with this, including the mailboxes, lawn services, etc.

"Edwin Regier stated that the residents feel as though they shouldn't be paying for the Wellness Center, Swimming Pool, etc. if the facilities are not ready for use.

"Max Graber asked if we are guilty of not informing the residents of matters that will take place and [affect] them?"

On April 24, 1991, paragraph 8 of the management agreement was amended, omitting all references to increases in management fees due to cost-of-living increases. The First Amendment to Management Agreement provides in paragraph 8:

"Compensation. It is understood and agreed that the cost and expenses incurred by the Manager in providing the services which are the subject of this agreement may fluctuate from time to time and that the management fee shall be adjusted annually by the Board of Directors of the Association, based upon the Board of Director's advance budget of the cash requirements needed by the Manager to provide for the administration and performance of its duties during the following year, adopted in accordance with Paragraph 8.3 of the Declaration of Kidron Bethel Condominiums. *The management fee may be adjusted at any time if the Board of Directors determines that an adjustment is necessary for the purpose of defraying the unbudgeted costs, fees and expenses incurred by the Manager* in carrying out its duties as set forth in this agreement, and if a special assessment is approved by the Board in accordance with paragraph 8.5 of the Declaration." (Emphasis added.)

The amendment was signed by Thomas C. Wentz, as President of KBRS and President of the Association.

In December 1991, the Board proposed to institute a $20 increase for management of facilities that were not included in 1989-90, and an additional $50 for items which were unforseen in the original agreement. This increase was approved by the Boards of both the Association and KBRS, and, commencing in January 1991, the fees were assessed at $295 and $375. In January 1993, the assessments were increased 3 percent to cover cost-of-living adjustments, and property taxes were taken out of the monthly assessments because the units were valued differently and because residents needed to show they had paid their taxes. From January 1993 through June 1994, the monthly fees were $265 and $330. In June 1994, the assessment rate was again increased by 2.6 percent to $271 and $338 to reflect social security cost-of-living increases. In May 1995, the assessment rate was increased by 2.8 percent to $278.59 and $347.46 to cover cost-of-living increases. In April 1996, the assessment rate was increased by 2.6 percent to $286 and $356 to cover cost-of-living increases. In April 1997, the assessment rate was increased by 2.9 percent to $294 and $366 to cover cost-of-living increases. In April 1998, the assessment rate was increased by 1.6 percent to $299 and $372 to cover cost-of-living increases.

The trial court found that all increases and assessments from 1990 were approved by the Boards of both KBRS and the Association. The Owners contend that the original management agreement limited the monthly assessment fee to $165 plus cost-of-living increases. They assert that the subsequent amendment to the agreement whereby limitations on the monthly assessment were removed is invalid because (1) there is a lack of consideration for the amendment and (2) it was not approved by the membership that (3) the amendments meant the contract contained no limitation of time to create a management contract.

The Board contends that the Owners have no standing to invoke the provisions of the original agreement because (1) the Owners were neither parties nor third-party beneficiaries to the contract, (2) the management agreement does not place a limit on monthly assessments to residents, (3) the management agreement was validly amended to conform the management fee to the amount of

monthly assessments made to Owners, and (4) the Owners claim for breach of management agreement is barred by laches.

First, the trial court found that the Owners had no standing to challenge the amended management agreement because they were not parties to the agreement between KBRS and the Association. The management agreement states that the "[a]ssociation is a not-for-profit corporation of owners of condominium apartments in the Kidron Bethel Village and it deems it to be in its best interest and that of its members" to enter into the contract. The agreement states that the purpose of the agreement is to relieve individual unit owners of the responsibility of managing condominium common areas. As provided in the declaration, the Owners are assessed for expenses, costs, and fees of management. Under the agreement, the Owners have an interest in the management fees sufficient to charge their directors with breach of fiduciary duty in entering into the contract, even if they have no standing to void the contract.

Here, the Boards of the Association and of KBRS are identical. The President of each Board, the same person, signed both contracts. The Boards are self-dealing. K.S.A. 17-6304 provides:

"(a) No contract or transaction between a corporation and one or more of its directors or officers, or between a corporation and any other corporation, partnership, association or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose,.if:

(1) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or

(2) The material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the shareholders; or

(3) The contract or transaction is fair as to the corporation as of the time it is authorized, approved or ratified by the board of directors, a committee thereof or the shareholders.

"(b) Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorized the contract or transaction."

Because there are no "disinterested" board members to affirm the amended management agreement, the transaction must comply with subsection (2) or (3) to withstand a challenge by one with standing to challenge the contract. The amended agreement was not put to a vote of the "shareholders," who are, by analogy, the owners; therefore, subsection (2) is not applicable. Subsection (3) applies to the amended agreement if the agreement is fair.

The original agreement provided for increases in the management fee commensurate with the cost of living. The original agreement is silent as to increases in the fee for other reasons. However, the Board amended the agreement by removing the cost-of-living limitations and providing for annual adjustments of the fee by the Board. The amended agreement does not provide that *KBRS* may adjust the fee periodically; it provides that the *Association* may do so. Therefore, the amended agreement does not give KBRS an additional benefit which would require that KBRS provide additional consideration. Under both the original management agreement and the amended agreement, the Association controls management fee non-cost-of-living adjustments. Of course, this conclusion assumes an arms-length transaction rather than a self-dealing transaction.

The trial court found:

"While the original management agreement between KBRS and [the Association] limited fee increases to cost-of-living increases from year to year, no similar restriction was included in the Declarations or in any of the residency agreement[s] signed by the plaintiffs. The cost-of-living restriction on management fee increases was deleted when the First Amendment to management agreement was duly approved by the Board of Directors of both KBRS and [the Association], in order to eliminate confusion between the Declarations and the terms of the management agreement regarding increases and monthly assessments."

The practices of KBRS and the Association were closely scrutinized. The trial court determined that the amended management agreement was supported by sufficient consideration, was fair and equitable, and was not, therefore, void.

Where the trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. *Tucker v. Hugoton Energy Corp.*, 253 Kan. 373, Syl. ¶ 1, 855 P.2d 929 (1993). The trial court's finding that the amendment is supported by sufficient consideration and was fair and equitable is affirmed.

## Monthly Assessments

The Owners assert that certain monthly assessments for condominium services are not authorized by the Apartment Ownership Act. They argue that assessments for Recuperative Care, the Wellness Center, Bethel College Program, Marketing/Public Relations/Community Service, Debt Service Charges, Street Debt Charges, and the Harvest Room are not assessments for "common areas" of the condominium project. They claim that fees for these services are to be charged on a "fee-for-services" basis.

The trial court found that the various contracts clearly provide for a single fee assessment for access to all the services provided by the Village. The court noted that the Village was conceived, developed, and marketed as a retirement community consisting of low-income housing, a nursing home facility, and the condominiums, with a broad array of services and facilities available in common to all residents. The court observed that the "village" concept was explained to prospective purchasers of the condominium units. Based on the testimony of residents, the trial court found that the Owners had a general understanding that they would be required to pay a set monthly fee for the maintenance of their own units and for facilities and services that the Village had available, regardless of their level of usage. The court did not address the Act in making its determination.

In the Act, common areas and facilities are defined in K.S.A. 58-3102:

"(g) 'Common areas and facilities,' unless otherwise provided in the declaration or lawful amendments thereto means and includes:

(1) The land on which the building is located;

(2) The foundations, columns, girders, beams, supports, main walls, roofs, halls, corridors, lobbies, stairs, stairways, fire escapes, and entrances and exits of the building;

(3) The basements, yards, gardens, parking areas and storage spaces;

(4) The premises for the lodging of janitors or persons in charge of the property;

(5) Installations of central services such as power, lights, gas, hot and cold water, heating, refrigeration, air conditioning and incinerating;

(6) The elevators, tanks, pumps, motors, fans, compressors, ducts and in general all apparatus and installations existing for common use;

(7) Such community and commercial facilities as may be provided for in the declaration; and

(8) All other parts of the property necessary or convenient to its existence, maintenance and safety, or normally in common use."

## Common expenses are defined in subsection (i) of the same statute:

"(i) 'Common expenses' means and include:

(1) All sums lawfully assessed against the apartment owners by the association of apartment owners;

(2) Expenses of administration, maintenance, repair or replacement of the common areas and facilities;

(3) Expenses agreed upon as common expenses by the association of apartment owners;

(4) Expenses declared common expenses by provisions of this act, or by the declaration or the bylaws."

## Limited common areas are defined by K.S.A. 58-3102 as:

"(m) 'Limited common areas and facilities' means and includes those common areas and facilities designated in the declaration as reserved for use of certain apartment or apartments to the exclusion of the other apartments."

## The declaration provides as follows:

"1.11 Common Expenses. 'Common Expenses' shall mean and refer to the following:

"(a) Expenses incurred by the Board in the maintenance, repair and replacement of common areas and facilities.

. . . .

"(d) Expenses incurred pursuant to any agreement with Declarant, or its assigns, to provide health services and facilities to the Board.

"(e) All other expenses agreed upon as common expenses by the Board."

## Regarding the purposes of assessments, the declaration provides:

"8.1. Purposes of Assessments. The assessments levied by the Board of Directors shall be used to discharge the duties imposed under Article Seven hereof. Proper uses of the assessments levied by the Board of Directors shall include, but are not limited to, the expenditure of funds for taxes, fees, expenses, charges, levies, premiums, expenditures or other costs of the Board of Directors for:

"(a) Providing for health services and facilities for the members.

"(b) Generally for any purposes and uses that the Board of Directors shall determine to be necessary to meet the primary purposes of the [Association].

"(c) Repairing, replacing and maintaining the common areas and facilities.

"(d) Installing, maintaining, and repairing roads and underground utilities upon, across, over and under any part of the subject property.

"(e) Furnishing garbage and trash pick up and water and sewer services.

"(f) Providing horticultural services . . . .

"(g) Obtaining and maintaining insurance . . . .

. . . .

"(i) Establishing and maintaining reserves for repairs, maintenance, taxes, capital improvements and other purposes.

"(j) Carrying out all other powers rights and duties of the Board of Directors.

. . . .

"8.3 Amount of Total Assessment. The annual assessment for each condominium unit for the first assessment year shall be in the amount of $165.00, multiplied by the number of months in such first assessment year. Commencing with the second assessment year and thereafter, the total annual assessments against all condominium units shall be based upon the Board of Director's advanced budget of the cash requirements needed by it to provide for the administration and performance of its duties during such assessment year, which estimates may include, among other things, the following:

"(a) Providing for health services and facilities for the members.

"(b) Any other costs, expenses and fees which may be incurred or may reasonably be expected to be incurred.

"(c) Expenses of management.

"(d) Premiums for all insurance which the Board of Directors is required or permitted to maintain as provided in Article Nine hereof.

"(e) Common lighting, heating and other utility charges, water charges, trash collection and sewer services charges.

"(f) Repairs and maintenance.

"(g) Wages for employees.

"(h) Legal and accounting fees.

"(i) Any deficit remaining from a previous assessment year.

"(j) The creation of reasonable contingency reserves, surpluses and sinking funds."

The Owners challenge several items as outside the scope of expenses contemplated by K.S.A. 58-3102 and the declarations. The challenged assessments are discussed separately.

## Recuperative Care

KBRS requires all condominium owners be assessed for recuperative care use. KBRS acknowledges that various condominium owners have insurance to cover these health care costs. The court found that even though recuperative care expenses were improperly assessed on a per person basis and not the per unit basis required by K.S.A. 58-3110 and the declaration, the Owners had failed to prove how much less they would have paid if the expense had been properly assessed on a per unit basis. The court noted that the recuperative care benefit is a $50 per day credit for up to 30 days per calendar year to be paid against costs of temporary care in the nursing home. The coverage provided a bridge between independent living and long-term nursing care. As such, the court found that this category is a "health service" within the meaning of section 8.1(a) of the declaration and a proper expenditure if properly assessed on a per unit basis.

We note that neither the Act nor the declarations require or allow that owners be assessed only services they require. The trial court found that the Owners should have anticipated such assessments when accepting their deeds. The trial court's reasoning and conclusion are correct.

## Wellness Center

The Wellness Center consists of health facilities, a professional managed exercise program, a swimming pool, spa, workout facility, and an exercise room with equipment. The trial court found that the Wellness Center was constructed expressly for the benefit of the condominium residents, even though non-residents may use it for a fee. The trial court observed that the Wellness Center as a health facility was within Section 8.1(a) of the declaration. The court noted that the Wellness Center was included in the marketing materials and should have been anticipated by the Owners. The court concluded although the expense was assessed improperly on a per person basis, when properly assessed, was within the common areas for which the Owners can be assessed.

Neither the Act nor the declarations require that Owners be assessed for only services they choose to use. Under the circum-

stances the Owners were informed of the assessment when they accepted their deeds. The trial court's conclusion is affirmed.

## Bethel College Program

The record does not address specific damages which the Owners claim to have suffered from the Bethel College program charges. The Owners did not itemize this charge in their complaint, and there is no evidence in the record on appeal that indicates it was a separate assessment in the budget. The trial court did not address the issue. Issues not raised before the trial court cannot be raised on appeal. *Lindsey v. Miami County National Bank*, 267 Kan. 685, 690, 984 P.2d 719 (1999).

## Marketing/Public Relations/Community Service Charges

KBRS originally assessed Owners for costs of marketing the Village. The trial court found that although KBRS's initial budget included a marketing category, the evidence established that on the advice of their accountants, the costs for marketing the condominiums for resale was deleted from the budget and not included in later resident assessments.

The marketing component shown in some budgets actually referred to costs of the community services director which was allocated to the condominiums. The community services director was in charge of coordinating community services and programs for the residents, organizing residents' support groups, supervising resident transportation to church and shopping, and obtaining governmental grants to purchase equipment for the benefit of condominium residents. The trial court found the allocated assessment authorized under the declaration to be reasonable and appropriate as to all the Owners.

The Owners assert that in reaching its conclusion the trial court ignored evidence that the Owners were charged a "marketing" fee. For support they point to a November 1992 letter by Jim Huxman, President. He states:

"The third allegation [addressed in this letter] concerns the marketing expense of $13,875.00 being charged to KB Condo, Inc. While the gain from the resale of the condo and duplex units is credited to KBRS. Let me remind you that reserve

funds previously established by the Bethel Home for the Aged were used to purchase the land and to construct the condos and duplexes that you are now living in. It is the commitment of the Board and administration to work at replenishing these funds.

"The marketing expense is further legitimatized by the fact that a priority list of prospects is continuing to be guilt so that when you desire to give up your unit, there will be a pool of buyers, and from the resale, the 90% buy back will be paid to you or your estate."

The letter indicates that a marketing fee was being charged until at least November 1992. Under the Act a marketing fee is not authorized as a common expense. As such, the fee was improperly assessed and must be returned to the Owners if not time barred.

### Debt Service Charges

The Owners contend that a debt service charge not related to "common area" expenses is improperly included in the monthly assessments nor was it assessed on a proportional basis per condominium unit. The district court held that the amounts charged improperly violated the "per unit" rule.

The debt service charges relate to industrial revenue bonds issued to finance construction of the health care center, the nursing home, the wellness center, and the administrative complex, including the main lobby area, the Harvest Table dining room, and a Menno Hall. As of 1991, the accountants had recommended that the portion of debt service attributable to condominium use be assessed to condominium owners. Twenty-two percent of the bond debt service was apportioned to the condominiums based on square footage usage. We note that the debt service allocation relates to the construction of the facility rather than the monthly operations of the facilities. The court found that this allocation and expenditure is reasonable and authorized under the declarations if properly assessed.

The Owners argue that because they never signed a document or agreed to pay or assume the obligation for repayment of the bonds, the bonds cannot be assessed to them. The trial judge determined that under the declaration a specific signed obligation is not required and concluded it was proper to include a portion of the capital costs associated with construction of the Village amen-

ities as a common expense. The trial judge's conclusion is supported by substantial competent evidence.

## Street Debt

The Owners allege that they improperly pay for the streets twice, a cost included in the purchase price of their condominium and as an assessment.

Board President Thomas Wentz testified that when the units were originally marketed, KBRS planned to pay for street assessments out of the sale price of the condominiums. However, KBRS obtained street financing through a municipal bond issue at a substantial cost savings over conventional financing. Instead of paying a higher initial purchase price, the residents paid the assessments over time. Wentz did not recall whether the price of the individual condominiums was reduced or when the assessments were charged but believed residents were not charged twice.

The record indicates that the Village marketing materials included a statement that:

"You receive a deed to the unit, and property taxes are paid monthly as part of the maintenance fee. All *purchase prices include* the unit *share of costs to construct streets*, curb and guttering, and utility lines. Therefore, there are *no special assessments* to pay on these improvements after you buy the unit."

Several Owners testified at trial that they relied on this statement when purchasing a condominium in the Village. The brochure is not dated. It cannot be determined if the brochure described the project prior to the municipal bond debt.

The trial court believed the testimony of Wentz. The Owners had not paid for the streets twice; therefore, the Owners' claim that they were overcharged for street assessments is without merit.

## Harvest Table Room

The Harvest Table is a dining facility located in the administration building. It was constructed for the benefit of the condominium residents. Residents receive their meals at less than the total cost of preparation.

The only reference to the Harvest Table in the trial court's decision is finding number 62, where the court stated:

"Of the expenditures not-for-common areas outlined above, the balance consists mostly of expenses incurred in the upkeep of the wellness center, main commons, Harvest room, lunch room or main building, which I find meets the test of reasonableness and are contemplated under the Declarations and were proper expenditures."

The Owners' primary complaint is that many condominium owners do not use the Harvest Table. As noted previously, actual use is not required to assess residents for the amenities provided in a condominium project. There is evidence to support the court's finding.

### Failure to Keep Proper Accounts and Records

The Owners contend that the evidence is overwhelming that KBRS breached its fiduciary duties by failing to keep a budget, communicating with residents, maintaining separate accounts, and preparing financial statements.

The trial court found that KBRS kept reasonably formulated budgets, subject to input and discussion of the finance committee and the full Board and resident members, whose views and opinions were solicited. The court found that every fee increase was implemented with the approval of the resident Board members; the Board communicated with the residents by letter, in person, and in town meetings to discuss resident concerns in general and to go over rate information with residents; and answered questions and concerns about the rate. The court determined that as of 1989, when the condominium association was formed, although separate books and records were not kept for the three entities, there was an allocation of costs and expenses among the three corporations. The court noted that neither KBRS nor the Board were always aware that separate books and records are required by the Act, but, acting on advice of counsel, the Board established separate books, separate budgets, and separate bank accounts in March of 1991. The trial court noted that the Board had allowed the corporate charter to lapse temporarily due to a technicality. It observed that the Board took steps to rectify this deficiency and to reinstate the corporate charter. The court concluded that although failure to

keep separate books violates the Act, the Owners had failed to show any damages attributable to that failure.

The Owners are correct the Board's failure to keep separate accounts and budgets for the Association was a breach of good faith and of its fiduciary duty. However, the Owners have failed to show damages caused by the breach. Without damages, the issue is moot.

## Carport Rents

The Owners complain that KBRS has never made an accounting for the income and expenses from carports it rents. At trial, the Board and KBRS submitted an accounting indicating that KBRS never netted a profit from the carports. The trial court concluded that the Owners had failed to prove damages.

The Owners contend that the accounting provided by the defendants does not comport with K.S.A. 58-3110, which provides: "The common profits of the property shall be distributed among, and the common expenses shall be charged to, the apartment owners according to the undivided interest in the common areas and facilities."

Based on the record, it would be difficult for an appellate court to conclude that the accounting provided by the defendants does not comport with K.S.A. 58-3110. The accounting provides substantial evidence to support the trial court's finding that there is no profit to distribute to the Owners from the rental of the carports.

## Mediation Agreement

The Owners next contend that the Association breached its fiduciary duties by failing to implement a plan for voting on assessments, approved in mediation prior to filing this action.

Before the lawsuit was filed, the parties attempted to resolve their differences by mediation. As part of the process, there was a joint committee formed to review resident fees. The committee consisted of residents and Board members. The committee was charged with examining the various charges and formulating a ballot to conduct a vote of the condominium residents as to whether they agreed or disagreed with the charges and to see if there were any services that could be dropped without affecting the overall

services of the Village. Overall, the majority of residents voted that the charges on most items were fair and voted overwhelmingly against dropping the emergency call system, the Wellness Center, and the Bethel College fees.

During the mediation process, the Board and an owner's attorney negotiated the amended and restated declarations. It was agreed that residents would be permitted to vote on all assessments and that future increases in the residents' assessments would be limited to cost-of-living unless resident approval was first obtained. From the record it is unclear what effect the vote would have.

In voting on the assessments, residents indicated that they believed the replacement/reserve assessments were too high. The Board agreed that the reserve levels were adequate and the assessments were reduced.

The Owners contend that the mediation agreement provided that the Owners were to be allowed to cast a binding vote on the entire monthly assessment. The Owners assert that the vote taken was in the form of an opinion poll, and they were not allowed to ask questions about the reserve and replacement account. The Owners contend that the Board breached its fiduciary duty by not complying with the mediation agreement.

The Owners have failed to include a copy of the mediation agreement in the record on appeal. An appellant has the duty to designate a record sufficient to establish the claimed error. Without an adequate record, the claim of alleged error fails. *In re B.M.B.*, 264 Kan. 417, 435, 955 P.2d 1302 (1998). Assertions in an appellate brief are not sufficient to satisfy inadequacies in the record on appeal. *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998). This court cannot review the defendant's compliance with the mediation agreement because the agreement was not included in the record.

## Relief Requested by Owners for Breach of Fiduciary Duties

The Owners urge this court to declare that the Board is illegally composed. Owners assert that the entire condominium mechanism was set up by KBRS to create and maintain absolute control over the owners of the condominiums and their association in perpe-

tuity. They assert that the record demonstrates that the Board consistently places the financial interests of KBRS above those of the Association. The Owners argue there is a fundamental and inherent conflict of interest between the KBRS Board and the Association Board and such a profound breach of fiduciary duties by KBRS and the Association requires the district court to dissolve the Association and its Board and order the creation of a new, independent condominium corporation and governing board.

KBRS, unlike the usual developer who eventually turns over control of the homeowners association to the homeowners, has no intention of relinquishing control. It intends to continue control by maintaining a substantial ownership interest in the condominiums and discontinuing the sale of fee simple interests.

However, as long as it continues to be a condominium development under the Kansas Act, it must comply with court orders regarding the composition of the Board and the voting rights of the owners. The district court ordered compliance, and this court affirms those orders as noted herein.

## Damages

The trial court found that the defendants' practice of buying back units from condominium owners at 90 percent of the original price, refurbishing them with money from the reserve and replacement account, and then reselling the units was an improper use of the reserve and replacement account. The court ordered the defendants to cease charging the Association reserve and replacement account for the cost of refurbishing the units for resale. The court granted each Owner judgment for $520.77 as each Owner's proportionate share of monies improperly paid for this purpose. We affirm the award.

## CROSS-APPEAL

The issues raised in the defendant's cross-appeal, the voting method ordered by the trial court, and the extent of developer control over the property owners' association have been previously addressed in the opinion.

## CONCLUSION

We affirm the following trial court rulings: The Association Board must be elected exclusively by the condominium owners. Although Board members must be elected by unit owners, Board members do not have to be unit owners. The Association Board owes a fiduciary duty to the unit owners. Past acts and decisions of the Association Board are not invalid for lack of authority.

The declarations are binding on the Owners. The amendment to the original management agreement is not void. As to damages, we affirm the trial court's order that common expenses must be apportioned on a unit basis rather than a per person basis. However, because the Owners failed to provide evidence proving the actual damages for the improper assessment, the trial court's refusal to award damages is affirmed. If properly assessed, charges for the recuperative care benefit, the Wellness Center, debt service charges, street assessments, and the Harvest Room are reasonable and proper as common expenses. Claims for breach of fiduciary duty for failure to keep separate books and accounts and for failure to distribute profits from carport rents is denied for failure to prove damages. The trial court's denial of the Owners' marketing fee claim is reversed because a marketing fee is not authorized as a common expense under the Act.

Affirmed in part, reversed in part, and remanded for further proceedings.

ABBOTT, J., not participating.

JUDGE STEPHEN D. HILL, assigned.