(154 P.3d 1094)
No. 94,273

DEREK H. BRENNAN and CATHERINE M. BRENNAN, Husband and Wife, *Appellees/Cross-appellants,* v. CHRISTIAN W. KUNZLE and JANET L. KUNZLE, *et al., Appellants/Cross-appellees.*

366

Opinion filed March 16, 2007.

*Michael E. Whitsitt*, of Westwood, for appellants/cross-appellees.

*Gary A. Schafersman, Eldon Shields*, and *James L. MowBray*, of Wallace, Saunders, Austin, Brown and Enochs, Chartered, of Overland Park, for appellees/cross-appellants.

Before GREEN, P.J., MARQUARDT, J., and BRAZIL, S.J.

GREEN, J.: This is a summary judgment case involving an allegedly fraudulent sale of a house. Christian and Janet Kunzle purchased a house from Derek and Catherine Brennan for approximately $1,000,000. The central issue in this case involves a failure by the Brennans to disclose a professional inspection report to the Kunzles. This report revealed potential latent defects in the house. The Kunzles argue that the failure to disclose this report constituted fraud by silence. Nevertheless, the Brennans contend that the Kunzles would have discovered the hidden defects if they had

inspected for water leaks before the sale. Although acknowledging that the Kunzles had conducted a number of inspections of the house, the trial court implicitly determined that had the Kunzles hired professional inspectors specifically for water leak issues, they would have learned of the defects. Consequently, the trial court granted summary judgment for the Brennans.

The Kunzles, however, had presented expert evidence that the defects were not discoverable through a reasonable inspection. As a result, the Kunzles maintain that the trial court inappropriately granted summary judgment because a genuine issue of material fact remained at issue. We agree, holding that the reasonableness of the Kunzles' inspections was a question of fact. Accordingly, we reverse and remand for trial on the Kunzles' fraud by silence counterclaim.

The Kunzles also appeal from the trial court's grant of summary judgment on their counterclaims of fraudulent and negligent misrepresentations, negligence, and breach of implied warranties in favor of the Brennans. We find no error in the grant of summary judgment on those counterclaims. Based on language in the buyers' acknowledgment of the sellers' disclosure statement, the Kunzles' failure to specifically indicate the representations on which they were relying barred them from maintaining a cause of action for affirmative or negligent misrepresentations. Moreover, the Kunzles have abandoned their arguments on their counterclaims of negligence and breach of implied warranties. We therefore affirm the trial court's summary judgment for the Brennans on the following counterclaims: affirmative and negligent misrepresentations, negligence, and breach of implied warranties.

Further, the Kunzles appeal from the trial court's judgment foreclosing their mortgage held by the Brennans. The Kunzles maintain that their mortgage should not have been foreclosed until their counterclaims of fraud and misrepresentation had been resolved. Because the Kunzles provide no relevant authority for their argument, they have essentially abandoned this issue. Moreover, we find no error and affirm the trial court's entry of judgment on the Brennans' mortgage foreclosure action because the Kunzles' coun-

terclaims did not provide a defense to and would not have affected the mortgage foreclosure.

Finally, the Brennans cross-appeal the trial court's award of attorney fees and the calculation of interest under the promissory note. The Brennans argue that the trial court erred in ruling that the parties did not agree to reimbursement for attorney fees incurred in defending the Kunzles' counterclaims. Nevertheless, we determine that the promissory note and mortgage allow the Brennans to recover attorney fees incurred in enforcing the promissory note and in foreclosing the mortgage but does not allow for attorney fees in defending the counterclaims asserted by the Kunzles. In addition, the Brennans contend that the trial court erred in determining that the interest rate on default should fluctuate monthly based on the statutory rate published by the Secretary of State under K.S.A. 2006 Supp. 16-207. We agree. We interpret the promissory note as requiring the interest rate on maturity to be the statutory rate published by the Secretary of State on that maturity date and that such rate shall continue until the unpaid principal balance is paid in full. Therefore, we reverse the award of interest and remand the case for the trial court to recalculate interest at the fixed rate of 7.93%. Accordingly, we affirm in part, reverse in part, and remand for trial; and reverse in part and remand with directions.

## Facts

The Kunzles entered into a real estate sales contract to purchase a house from the Brennans for approximately $1,000,000. The Kunzles partially financed the house by taking out a mortgage for $435,000 with the Brennans and signing a promissory note. The real estate contract contained a provision allowing the Kunzles to conduct property inspections. Moreover, the contract stated that if the buyers failed to conduct inspections, the buyers "shall have waived any right to cancel or renegotiate this Contract pursuant to the inspection provisions."

As part of the contract, the Kunzles also signed a sellers' disclosure statement that had been filled out by the Brennans. In the "ROOF" category of the disclosure statement, the Brennans

checked the box "Yes" as to whether any insurance claims had been made in the past 5 years; they also checked "Yes" as to whether repairs were made from the claims. The contract required the Brennans to list the name of the company that did the repairs. The Brennans wrote "Reeds' Restoration" in the space provided. The contract also required the Brennans to explain in detail any answers that were marked "Yes." The Brennans wrote in the space furnished: "3 windows leaked—solution caulking. Chimney flashing repaired to eliminate 4th window leak."

Christian Kunzle testified that before signing the disclosure statement, he asked Derek Brennan about the written disclosures. Regarding the insurance claim, Christian testified that Derek told him there had been some wind damage and that some ridges had broken off of the roof but that he had it repaired. When Christian asked about the four window leaks, Derek explained the caulking and grouting process that had been done to repair the leaks. Christian testified that after going over the disclosure statement with Derek, he asked Derek if there was anything else to add in terms of repairs, modifications, or other issues that would affect a buyer of his home, but Derek replied, " 'No.' "

Before closing on the house, the Kunzles hired Larry L. Vaught Roofing to inspect the roof of the house. In his roof inspection report, Vaught noted that he had examined two leaks in the house, one above the kitchen and one in the master bedroom. Vaught stated that both of the leaks were likely attributable to roof flashing detail and submitted a proposal of recommended roof repairs. Vaught's opinion was that the roof was predominantly installed per accepted standards and would continue to provide several years of service. The Kunzles also hired Bruce Bird, a structural engineer, to perform a structural inspection of the house. During his inspection, Bird found no evidence of a structural problem but did advise that the patio be regraded so that water would drain away from the house.

In addition, the Kunzles had inspections performed on the heating and cooling system, the chimney, and the septic system. The property was also inspected for termites and tested for radon. Moreover, Christian Kunzle made several personal inspections of

the house, taking notes of the things that he wanted fixed. The Kunzles also had their friend, Jim Lambie, a developer of single family residences, walk through the house to look for potential problems.

While walking through the house with Lambie, Christian discovered water and mold on the carpet in a study and water on the floor of the media wiring closet in the basement. In his deposition, Derek Brennan indicated that he discovered these leaks when he returned to the house in June 2001. In a document titled "Statement of Condition—Update 8/2/01," the Brennans disclosed the leak in the study and the leak in the wiring closet and another leak that they had discovered at the top of a laundry room window. The Brennans set forth the corrective actions that they had taken to repair the leaks, which included professional caulking, mending of the carpet, and installation of step flashing.

On July 11, 2001, the Kunzles delivered an "Inspection Notice" to the Brennans and initialed the option of "Offer to Renegotiate," indicating that they had found unacceptable conditions from the written opinions of professionals who had inspected the property. They attached an "Addendum A" setting forth a list of the unacceptable conditions.

During a meeting discussing a list of the proposed repairs to the residence, Christian specifically asked Derek if there was anything else they needed to know about the house. According to Christian, Derek stated that the disclosure statement was complete and that he did not want to add anything else.

On July 25, 2001, the parties signed an amendment to the contract. Attached to the amendment was "Addendum A," a list of 41 unacceptable conditions. Under the amendment, the Brennans agreed to pay the Kunzles $1,475 for 7 of the items listed in Addendum A. The Brennans agreed to correct the remaining items in Addendum A.

The Kunzles closed on the house on August 3, 2001. The Kunzles took out a $435,000 mortgage with the Brennans and signed a promissory note. Several days after the Kunzles moved into the house, they discovered water infiltration in an interior wall in the house. The problem was discovered when a painter attempted to

sand out some blisters on the baseboards and discovered that the baseboard's veneer was mushy and wet.

After this discovery, the Kunzles undertook a process of destructive testing to identify areas where water was infiltrating through the exterior of the house. In addition, the Kunzles had tests performed to determine where water was infiltrating through the walls. During these tests, the Kunzles found evidence of water infiltration around many of the windows and also discovered damage to the home's sheathing. In addition, the Kunzles discovered that many of the control joints of the masonry stucco were sources of water infiltration. Moreover, the area where the deck joined the house was a source of significant water infiltration and damages. The Kunzles spent more than $500,000 to remediate the water infiltration problems.

In September 2001, the Brennans, for the first time, disclosed to the Kunzles a report that had been completed in 1999 by Laurence Fehner, a professional engineer with Norton & Schmidt Engineers LLP. Fehner's report detailed an inspection he had performed in October 1999, concerning four water leak areas in the house. In describing his examination of the first water leak area, Fehner noted that the leak problems were significant enough that a hole was cut in the ceiling to observe the underside of the roofing. Based on his observations, Fehner indicated that the metal roofing products were not the cause of the leak problem. In examining the exterior of the home, Fehner observed no signs of vapor barrier or felt paper behind the stucco finishes at the bottom edge:

"A review outside the home of the area in question revealed several areas where there are significant leak potentials. The exterior cladding is a synthetic stucco system. . . . I observed no signs of vapor barrier or felt paper behind the stucco finishes at the bottom edge."

Fehner then noted several problems with the wall system in and around the leakage areas above the sitting room, including inadequate flashings and joint conditions:

"A review of the wall system in and around the leakage areas above the sitting room revealed that there are no kickout flashings where gutters abut the wall. . . . This is contrary to most typical details provided by EMMA and synthetic stucco suppliers who typically require kickout flashings at these

points. . . . The joints between the synthetic stucco finishes and the windows are not jointed or sealed. The synthetic stucco finishes were simply butted to the window frame. Water which penetrates at these various points simply proceeds downward through the wall cavity where it intersects various floor and header framing and then leaks in. Further, the flashings above the half round window terminate and are not kicked out. This condition results in water sheeting down the face of the wall being able to penetrate down through the joints along the sides of the window."

After making several observations about the conditions in the room above the sitting room, Fehner indicated that the leak problems were not related to the main roof of the house. Fehner then stated that additional destructive testing would have to be completed in order to pinpoint the exact location of the leak:

"Additional testing can be performed, however, [that] may result in additional damages to the home or involve some destructive testing. To exactly pinpoint the leak location will require holes being made in the exterior siding of the home so that moisture probes can be inserted. Additionally, interior finishes will need to be cut open to expose various other areas. Water testing of both various wall details and the windows can also be performed. There are no open or obvious signs that the window system itself is leaking, however, the water test can verify if it is contributing to the leak problems."

In discussing a second leak in the first floor sitting room, Fehner stated:

"Water stains were observed on the sheetrock finishes below the sill at each corner of the window. Again, a review was made outside and I found that the synthetic stucco finishes were simply butted to the jambs of the window. . . . Mr. Brennan explained that the leak problems only occurred when there were significant winds and they did not generally develop when the rain was straight down. This condition, again, indicates that the leak problems are related to problems with the walls and not the main roof of the house."

Fehner opined that this second leak area occurred from water "leaking in along the butted joints of the wall finishes to the jambs of the window systems both on the first and second floor."

Fehner concluded his report with his opinion that the leak problems experienced in the house were "related to various flash, joints and trim detail." Fehner stated that the leak problems could be corrected "by properly correcting all of the various flashing, joint and trim conditions noted." Nevertheless, Fehner stated that no

attempt had been made to review components that were not readily viewable; that no destructive testing or moisture testing had been performed; and that nondestructive moisture testing could not be performed due to the mesh used in the synthetic stucco finishes.

The Brennans received the Norton & Schmidt report in late 1999. Fehner had been sent to the house after the Brennans had discovered water leaks around some windows in the house and had called Rick Revelle with Revelle Homes, Inc. Revelle came out to the house to examine the leaks and eventually contacted his subcontractors to inspect the roof and the windows. Fehner was sent to the house by Revelle's insurance company.

Based upon the Norton & Schmidt report, Revelle prepared a remediation plan and cost estimate, which were submitted to Revelle's insurance company. In May 2000, the Brennans accepted $12,594 in full settlement of its claims against Revelle and its insurance company. Of this amount, only $4,560.32 was spent on the suggested repairs. The repairs were completed in November 2000. The Kunzles did not learn about the Revelle remediation plan until it was disclosed during the discovery process of this case.

In March 2002, the Brennans sued the Kunzles after the Kunzles defaulted on their mortgage and promissory note. In an amended petition filed in October 2002, the Brennans sought payment of the note and foreclosure as a first and prior lien on the property. The Kunzles answered the petition and counterclaimed against the Brennans. In their answer, the Kunzles maintained that the Brennans' claims were barred by fraud, misrepresentation, and negligence of the Brennans. The Kunzles contended that they had the right to rescind the contract to purchase the residence.

In their amended counterclaims, the Kunzles sought damages based on the theories of fraud and negligent misrepresentations by the Brennans (count I); negligence by the Brennans in the design and construction of the residence and in the repairs made to the residence (count II); and breach of implied warranties by the Brennans (count III). In regard to their fraud and negligent misrepresentation counterclaim, the Kunzles asserted that the Brennans had intentionally failed to disclose material facts relating to the

condition of the residence. The Kunzles set forth a list of several things that the Brennans had failed to disclose, including the Norton & Schmidt report from October 1999.

In April 2004, the Brennans moved for summary judgment on the Kunzles' amended counterclaims. On the Kunzles' counterclaim relating to fraud and negligent misrepresentations, the Brennans argued that the Kunzles could not reasonably rely upon the truth or falsity of their representations because the contract gave the Kunzles the right to inspect and specifically stated that the Brennans' representations were not warranties.

In responding to the Brennans' motion for summary judgment, the Kunzles provided an affidavit from Vernon Reed, an architect who had been hired by the Kunzles to investigate the water infiltration problems after they moved into the house. Reed's opinion was that "the causes of the leaks in the Kunzle residence were the result of improper and defective construction techniques." Reed testified as follows:

"The nature and existence of the leaks in this house, and the extent of those leaks, would normally not be discoverable in the absence of some specific direction being given to the investigator to a particular problem, and then, absent destructive testing, the full extent of the problem would not be discoverable under normal circumstances."

In addition, Reed testified that the Brennans had not provided enough information to the Kunzles to justify retaining a professional inspector, such as a civil engineer or an architect, to conduct further investigation of the water leak problems before closing:

"I do not believe that enough information was given to the Kunzles by their sellers to justify the retention of a civil engineer, such as Larry Fehner, or an architect to undertake inspection of this house prior to closing. It would be unusual and unnecessary, in most circumstances, to have a civil engineer or architect inspect a residence prior to closing."

Moreover, noting that the information provided in the Norton & Schmidt report would have warranted further investigation, Reed stated:

"I read the Norton & Schmidt report at sometime prior to June 8, 2002 and after the Kunzles purchased the residence. Had the Kunzles been furnished a copy of that report prior to closing, that most certainly would have suggested

further inspection-investigation by the Kunzles of the exterior covering of the house."

Despite Reed's affidavit, the trial court granted summary judgment to the Brennans on all of the Kunzles' counterclaims. On the Kunzles' counterclaim of fraud and negligent misrepresentations, the trial court noted that the Kunzles had agreed that they would verify conditions in the house through their own inspections. Pointing out that the Kunzles had failed to hire a water leak inspector, the trial court stated:

"The Kunzles, knowing of some prior water leak problems in the house, failed to hire professional inspectors to look at the water related items. The Kunzles did hire professional inspectors, but only for roof and structural issues. Kunzles agreed to accept the house 'as is' following their opportunity to inspect and after their list of repair items in 'Addendum A' to the Amendment in the sale contract were resolved to their satisfaction. The Kunzles had agreed that the Brennans' disclosures were not a warranty and that the Kunzles would rely on the inspections they had been advised to obtain."

The trial court found, as a matter of law, that the Kunzles could not have reasonably relied on the Brennans' representations and, therefore, could not maintain an action for fraudulent or negligent misrepresentation against the Brennans.

The Kunzles moved for a reconsideration of the trial court's rulings on its counterclaims. Nevertheless, the trial court affirmed its previous rulings. On the Brennans' foreclosure action, the trial court ruled that the mortgage should be foreclosed as the Kunzles had admitted to signing the mortgage and note but had stopped making payments. Moreover, the trial court granted judgment against the Kunzles for $433,924.24, plus interest of $73,145.40 through August 2004.

## Trial Court Judgment

*Should summary judgment have been granted to the Brennans on the Kunzles' counterclaims?*

On appeal, the Kunzles argue that the trial court erred in granting summary judgment to the Brennans on the counterclaims. An appellate court's standard of review in summary judgment cases is

set forth in *Mitchell v. City of Wichita*, 270 Kan. 56, 59, 12 P.3d 402 (2000):

" 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issues to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact . . . . to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citation omitted.]' "

Moreover, a review of the trial court's grant of summary judgment in this case requires interpretation of the real estate sales contract and other documents pertaining to the sale of the residence. The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. *McGinley v. Bank of America, N.A.*, 279 Kan. 426, 431, 109 P.3d 1146 (2005). "Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. [Citation omitted.]" *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001).

Here, the trial court granted summary judgment on the Kunzles' three counterclaims: fraud and negligent misrepresentation; negligence in the design and construction of the house and in the repairs done on the house; and breach of implied warranties. Although not clearly delineated in the Kunzles' answer and amended counterclaims, it is apparent that count I relating to fraud and negligent misrepresentations includes two causes of action: fraud by silence and negligent misrepresentations. Each of the above theories will be discussed separately.

*Fraud by Silence*

In reviewing whether the trial court erred in granting summary judgment on the Kunzles' fraud claim, this court reviews the facts in the light most favorable to the Kunzles. See *Patterson v. Brou-*

*hard,* 246 Kan. 700, 702, 792 P.2d 983 (1990). Moreover, the existence of fraud is normally a question of fact. Therefore, on appeal, this court's standard of review is limited to determining whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *Alires v. McGehee,* 277 Kan. 398, 403, 85 P.3d 1191 (2004). Furthermore, "[a] court should be cautious in granting a motion for summary judgment when resolution of the dispositive issue necessitates a determination of the state of mind of one or both of the parties." *Ruebke v. Globe Communications Corp.,* 241 Kan. 595, 605, 738 P.2d 1246 (1987). Even though fraud must be proved by clear and convincing evidence, a party resisting a motion for summary judgment in an action for fraud need not present clear and convincing evidence of fraud to oppose the motion. *Dugan v. First Nat'l Bank in Wichita,* 227 Kan. 201, 207, 606 P.2d 1009 (1980).

Actionable fraud may be based upon an affirmative misrepresentation made as to existing and material facts or upon a suppression of facts which the party is under a legal or equitable obligation to communicate. See *Broberg v. Boling,* 183 Kan. 627, 634-35, 331 P.2d 570 (1958) (affirmative misrepresentation); *Wolf v. Brungardt,* 215 Kan. 272, Syl. ¶ 4, 524 P.2d 726 (1974) (fraud by silence).

In setting forth count I of their counterclaims, the Kunzles alleged that the Brennans had failed to disclose several material facts, including the Norton & Schmidt report, before they closed on the house and took possession in August 2001. The Kunzles' fraud claim is based on the Brennans' alleged fraudulent nondisclosure, or fraud by silence, of certain material facts relating to the condition of the house. To establish fraud by silence against a seller, a buyer must show by clear and convincing evidence the following elements: (1) the seller had knowledge of material facts which the buyer did not have and which the buyer could not have discovered by the exercise of reasonable diligence; (2) the seller was under an obligation to communicate the material facts to the buyer; (3) the seller intentionally failed to communicate the material facts to the buyer; (4) the buyer justifiably relied on the seller to communicate

the material facts; and (5) the buyer sustained damages as a result of the seller's failure to communicate the material facts to the buyer. *McLellan v. Raines*, 36 Kan. App. 2d 1, Syl. ¶ 5, 140 P.3d 1247 (2006).

Although the Kunzles' allegations in count I of their counterclaim follow the elements of fraud by silence, it appears that the trial court never addressed this theory. In responding to the Brennans' motion for summary judgment, the Kunzles set forth the elements of fraud by silence and argued that the Brennans had intentionally withheld material information from them. Nevertheless, the trial court granted summary judgment to the Brennans on count I of the Kunzles' counterclaims by determining that the Kunzles could not maintain a cause of action sounding in fraudulent or negligent misrepresentation. The elements of fraud by silence, which are set forth above, are different from the elements of both fraudulent misrepresentation and negligent misrepresentation. See *Broberg*, 183 Kan. at 634 (elements of fraud based on affirmative misrepresentation); *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, 604-05, 876 P.2d 609 (1994) (establishing cause of action for negligent misrepresentation).

*Seller's Duty to Disclose*

Fraudulent nondisclosure, or fraud by silence, depends in large part on the buyer's inability to discover a defect with a reasonable inspection. A seller can incur a responsibility to disclose material facts when the seller has knowledge of a defect in the property which is not within the fair and reasonable reach of the buyer and which the buyer could not discover through the exercise of reasonable diligence. *Green v. Geer*, 239 Kan. 305, 308, 720 P.2d 656 (1986); *Boegel v. Colorado Nat'l Bank of Denver*, 18 Kan. App. 2d 546, 550, 857 P.2d 1362, *rev. denied* 253 Kan. 856 (1993).

In responding to the Kunzles' arguments, the Brennans maintain that the trial court's ruling, which never addressed the theory of fraud by silence, is correct. Nevertheless, the Brennans' main defense was (1) that they did not fail to disclose "material facts" relating to the house and (2) that even if they had failed to disclose some information before the Kunzles accepted the house, the in-

formation was reasonably discoverable by the Kunzles upon inspection.

*Brennans' Knowledge of Material Facts*

The Kunzles point to several things that the Brennans failed to disclose before the closing on the house. The central focus of the Kunzles' argument, however, seems to be the Norton & Schmidt report that the Brennans had received in 1999 but failed to disclose to the Kunzles before they closed on the house. The Kunzles maintain that had they been provided a copy of the Norton & Schmidt report, they would have undertaken an inspection for exterior stucco problems or would have opted out of the contract.

On the other hand, the Brennans maintain that the Norton & Schmidt report was "simply peripheral information about the history of the house." The Brennans contend that when the house was sold, they believed that all repairs listed in the Norton & Schmidt report had been completed. The Brennans maintain that they revealed all they knew concerning the material conditions of the property.

Nevertheless, the Norton & Schmidt report was material because it would have alerted the Kunzles that the real source of the water leaks could not be pinpointed without conducting additional destructive testing. In his report, Fehner stated:

"To exactly pinpoint the leak location will require holes being made in the exterior siding of the home so that moisture probes can be inserted. Additionally, interior finishes will need to be cut open to expose various other areas. Water testing of both various wall details and the windows can also be performed."

Moreover, the Norton & Schmidt report would have alerted the Kunzles to some concerns with the construction of the house. Fehner detailed several areas where there was improper flashing and questionable joint conditions. In addition, after reviewing the exterior of the home, Fehner noted that there were "several areas where there are significant leak potentials." Fehner stated that the exterior cladding was a synthetic stucco system and that he "observed no signs of vapor barrier or felt paper behind the stucco finishes at the bottom edge."

The Brennans had received this Norton & Schmidt report in 1999 and thus had knowledge that the actual source of the visible water leaks could not be determined without conducting additional destructive testing. Moreover, the Brennans possessed this knowledge while the Kunzles were inspecting the home. In addition, the Brennans possessed this knowledge when they later disclosed several visible water leaks after the Kunzles had signed the original purchase contract and represented that the water leaks had been repaired. Although they possessed the Norton & Schmidt report that indicated the actual source of the water leaks could not be pinpointed without conducting additional destructive testing, the Brennans represented that all "corrective actions" had been completed.

Although the Brennans dispute the materiality of the Norton & Schmidt report, they maintain that they disclosed the contents of the report in their disclosure statement. The Brennans maintain that "all the information that was contained in the [Norton & Schmidt] report was included in the disclosure statement and Mr. Brennan checked 'Yes' in the appropriate boxes on the disclosure statement." Consequently, the Brennans argue that no "material facts" went undisclosed. Nevertheless, the Brennans specifically stated in their disclosure statement that several windows had leaked and that those leaks had been repaired with caulking and flashing. Those disclosures, however, would not have suggested to a prospective buyer or an inspector what was causing the water leaks. Further, the Brennans made their disclosures of the water leaks under the "Roof" portion of the disclosure statement. Both the Norton & Schmidt report and the Kunzles' inspection report, however, determined that the roof was not the main cause for the water leaks. Particularly, the Brennans' disclosure statement was absent of any reference to the synthetic stucco system and to the possible absence of a vapor barrier or felt barrier behind the stucco finishes. As a result, the Brennans' disclosure statement would not have alerted a prospective buyer or an inspector that absent destructive testing, the cause of the water leaks could not be pinpointed.

In pointing out the significance of the Norton & Schmidt report, the Kunzles presented the testimony of Reed. He testified that the Norton & Schmidt report "most certainly would have suggested further inspection-investigation by the Kunzles of the exterior covering of the house." "A matter is material if it is one to which a reasonable man would attach importance in determining his choice of action in the transaction in question. [Citation omitted.]" *Griffith v. Byers Construction Co.*, 212 Kan. 65, 73, 510 P.2d 198 (1973). In determining whether to purchase a home, a reasonable person would attach importance to a professional report that alerted them to further investigation of a house in order to discover the source of water leaks. See *Lynn v. Taylor*, 7 Kan. App. 2d 369, 371-72, 642 P.2d 131, *rev. denied* 231 Kan. 801 (1982) (Failure to reveal the existence of an unfavorable termite inspection was fraud.).

As has been noted, the Kunzles, through their inspections, were attempting to gather information about the home's soundness. The Kunzles planned to use this information to determine whether to complete the purchase of the home. To know that the actual source of the water leaks could not be determined without conducting additional destructive testing would have been very important to a prospective buyer. All inferences from the evidence must be given to the nonmoving party. "Factual inferences tending to show triable issues must be considered in the light most favorable to those issues." *Seabourn v. Coronado Area Council, B.S.A.*, 257 Kan. 178, 189, 891 P.2d 385 (1995).

## Discovery of Information Through Reasonable Diligence

The Brennans maintain, however, that the Kunzles would have discovered the hidden defects if they had inspected for water leaks before the sale as they had done after the sale. The Brennans contend that the Kunzles were aware of numerous water leaks within the home but failed to inspect for the cause of the water leaks until after the sale. On the other hand, the Kunzles argue that the defects were latent and that they could not have discovered the source of the water leaks based on the information provided to them by the Brennans.

In granting summary judgment to the Brennans, the trial court pointed to the fact that the Kunzles failed to hire a professional inspector for the water leaks. The trial court stated that the Kunzles had agreed that if they failed to inspect or if they inspected but failed to notify the Brennans of unacceptable conditions, they would waive their rights to cancel or renegotiate any part of the contract. The trial court stated that "[t]he Kunzles, knowing of some prior water leak problems in the house, failed to hire professional inspectors to look at the water related items."

The trial court's holding, however, goes to the reasonableness of the Kunzles' inspections, which is a fact question. Under the contract, the Kunzles waived any right to cancel or renegotiate the contract under the inspection provisions only if they failed to conduct inspections. As the Kunzles point out, they did have inspections done to the house, including inspections for roof and structural issues. The roof inspector examined leaks discovered in the house and gave his opinion that they were likely attributable to roof flashing detail. In addition to numerous other inspections, the Kunzles had a structural engineer perform a structural inspection of the house. Because the Kunzles had inspections, they did not waive their rights under the contract.

Moreover, in support of their counterclaims, the Kunzles presented expert testimony that they had not been provided with enough information to warrant further inspection of the water leak issue. Reed testified about the lack of information: "I do not believe that enough information was given to the Kunzles by their sellers to justify the retention of a civil engineer, such as Larry Fehner, or an architect to undertake inspection of this house prior to closing." Reed further stated that "[i]t would be unusual and unnecessary, in most circumstances, to have a civil engineer or architect inspect a residence prior to closing." At the very least, Reed's affidavit created a genuine issue of material fact as to the reasonableness of the Kunzles' inspections based on the information they had been provided by the Brennans.

The Brennans maintain that *Alires*, 277 Kan. 398, coupled with this court's recent decision in *Phillips v. Tyler*, 35 Kan. App. 2d 256, 129 P.3d 656, *rev. denied* 281 Kan. 1378 (2006), controls the

outcome of this case. *Alires* has limited application in this case as it involved a fraudulent misrepresentation claim. Moreover, *Alires* is factually distinguishable because the buyers in that case did not have inspections done and they acknowledged that an inspection would have revealed the defect about which they were complaining. Our Supreme Court in *Alires* held:

"Under the facts of this case, the buyer of real estate could not reasonably rely upon representations of the seller when the truth or falsity of the representation would have been revealed by an inspection of the subject property and the misrepresentations were made prior to or as part of the contract in which the buyer contracted for the right to inspect, agreed that the statements of the seller were not warranties and should not replace the right of inspection, declined inspection, and waived any claims arising from defects which would have been revealed by an inspection." 277 Kan. at 411-12.

In reaching this holding, our Supreme Court stated that in order to prove their case, it was incumbent upon the buyers to establish that even if an inspection had been performed, the water leakage problems in the basement would not have been apparent. 277 Kan. at 410. The buyers, however, provided no such evidence.

Here, the Kunzles did have inspections performed, but they did not discover the defects that were causing the leaks. Moreover, the Kunzles presented evidence through Reed's affidavit indicating that the defects would not have been discovered during a normal inspection. Therefore, *Alires* is factually distinguishable.

*Phillips* also has limited application to the instant case as it involved a negligent misrepresentation claim. Moreover, in that case, evidence of the water infiltration problems in the house was discovered during the buyers' inspections. Specifically, the inspection report revealed evidence of past roof leakage and also informed the buyers that the synthetic stucco system installed on the house was a "water-barrier" system no longer recommended by most major manufacturers. The inspection report further informed the buyers that a wet-wall detector had " 'indicated possible moisture below all roof-to-wall joints and around or below most windows.' " 35 Kan. App. 2d at 264. The report noted that there was a potential for hidden dry rot and recommended that additional evaluation and repairs be made by a licensed qualified contractor. Thus, the

buyers were put on notice that there were many potential problems with the house. This court held that the buyers' failure to conduct a more detailed test of the roof, along with their decision to allow the sellers to contract for limited liability, prevented a claim for negligent misrepresentation. 35 Kan. App. 2d at 264-65.

The knowledge obtained by the buyers in *Phillips* concerning a potential defect was similar to that obtained by the buyer in *McLellan*, 36 Kan. App. 2d 1, which was cited by the Brennans in a letter of additional authority under Supreme Court Rule 6.09(b) (2006 Kan. Ct. R. Annot. 44). In *McLellan*, shortly after the buyer purchased and moved into her house, water began leaking into the basement. The buyer brought a fraud by silence claim against the sellers, the real estate agents, and the real estate agency. The trial court granted summary judgment on the fraud by silence claim, and this court affirmed. 36 Kan. App. 2d at 9-16. In that case, however, the buyer had received information warning her of a potential defect with the house prior to closing. In the disclosure statement, the sellers had marked "Yes" in the paragraphs dealing with settling, shifting, and cracking of the foundation and basement walls. In addition, the buyer's inspections revealed a crack in the home's foundation. The inspection report recommended fixing the crack to prevent the chance of leaks. The buyer, however, chose not to have the inspector's recommended repairs performed. Instead, she bargained with the sellers to lower the purchase price.

Here, however, the Kunzles never had the information that the buyers in *Phillips* or *McLellan* had before closing on the house. Although the Kunzles conducted numerous inspections on the house, nothing was revealed during the inspections that would have suggested a major defect in the house.

One of the propositions of law relied upon by the Kunzles is: "Where one party to a contract or transaction has superior knowledge or knowledge which is not within the fair and reasonable reach of the other party and which he could not discover by the exercise of reasonable diligence, or means of knowledge which are not open to both parties alike, he is under a legal obligation to speak, and his silence constitutes fraud." *Wolf v. Brungardt*, 215 Kan. 272, 282, 524 P.2d 726 (1974); *Fouts v. Armstrong Commer-*

*cial Laundry Distributing Co.*, 209 Kan. 59, 69-70, 495 P.2d 1390 (1972). While the above-mentioned statement of law is well settled, this rule of law might be abused by real estate sellers and realtors. In characterizing the seller's disclosure statement and the buyer's acknowledgment and agreement in a real estate contract as essentially a disclaimer of liability, Professor William E. Westerbeke warned: "[T]his disclaimer could be at odds with cases in which the seller or realtor simply fails to disclose known defects in the house." Westerbeke, *Survey of Kansas Tort Law: Part II*, 50 Kan. L. Rev. 225, 280 (2002). There is no doubt that the Brennans knew that the actual source of the water leaks could not be pinpointed without additional destructive testing but failed to disclose this information.

Whether there is a duty to disclose depends on whether the defects could have been discovered by a reasonable inspection. The Kunzles conducted a number of inspections, but they did not discover the defects until after taking possession of the house. Moreover, the Kunzles presented evidence that the defects were not discoverable through reasonable inspections. The reasonableness of the Kunzles' inspections was a question of fact. " 'It is only when it can be said that reasonable persons could reach but one conclusion from the same evidence that an issue may be decided as one of law.' " *Seabourn*, 257 Kan. at 189 (quoting *Williams v. Community Drive-In Theater, Inc.*, 214 Kan. 359, 364, 520 P.2d 1296 [1974]). Because more than one conclusion can be drawn from the same evidence, the trial court erred in determining as a matter of law that the Kunzles failed to establish a genuine issue of material fact as to whether the defects could have been discovered had the Kunzles hired "professional inspectors to look at the water related items." The determination of whether the defects were discoverable through a reasonable inspection was a function of the trier of fact. See *Jenkins v. McCormick*, 184 Kan. 842, 843-45, 339 P.2d 8 (1959) (The trial court properly overruled a demurrer to a petition alleging that the vendor had failed to disclose to the vendee of realty a known defect in the basement floor and that such defect could not be discovered by the vendee in the exercise of reasonable diligence.).

*Fraudulent Misrepresentations*

In order to establish an action for fraud, the Kunzles must prove that there was "an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or with reckless disregard for the truth, upon which another party relies and acts to his or her detriment. [Citation omitted.]" *Alires v. McGehee*, 277 Kan. 398, 403, 85 P.3d 1191 (2004).

Based on the language in the disclosure statement in this case, it appears that the Kunzles cannot establish their reliance on the Brennans' statements in the disclosure statement or those made before the disclosure statement was signed. Just above the Kunzles' signature line, paragraph 5 of the "Buyer Acknowledgment and Agreement" section of the disclosure statement states: "I specifically represent that there are no important representations concerning the condition or value of the property made by SELLER or BROKER on which I am relying except as may be fully set forth in writing and signed by them." Because the Kunzles did not indicate any representations upon which they were relying, they appear to have waived their right to rely on the Brennans' statements in the disclosure statement and those made before the disclosure statement was signed.

The language in the buyers' acknowledgment here is distinguishable from that found in *Alires*. In that case, the sellers' disclosure statement contained the following acknowledgment: " 'I state that no important representations concerning the condition of the property are being relied upon by me *except as disclosed above* or as fully set forth as follows . . . .' " 277 Kan. at 402. Our Supreme Court noted that one of the alleged fraudulent representations was already listed in the disclosure statement itself. Our Supreme Court held that there was no need for the buyers to write in the representations on which they were relying because the representation was already listed.

Here, however, the buyers' acknowledgment does not contain the language "except as disclosed above," as in *Alires*. Rather, the buyers' acknowledgment here required the Kunzles to specifically indicate which representations on which they were relying. The

language in the buyers' acknowledgment here was present in *McLellan*, where this court held:

"Under the facts of this case involving a real estate transaction, the language of the buyer's acknowledgment in a disclosure statement was unambiguous and clearly directed the buyer to either indicate which representations she was relying on or agree to rely on none of them. When she did not so indicate, she waived her right to rely on the sellers' representations in the disclosure statement." 36 Kan. App 2d 1, Syl. ¶ 2.

Here, the Kunzles' failure to specifically set forth the Brennans' representations on which they were relying precludes their fraudulent misrepresentation claim.

*Negligent Misrepresentations*

The Kunzles also assert that the Brennans made negligent misrepresentations concerning the condition of the house. The tort of negligent misrepresentation was first recognized in *Mahler v. Keenan Real Estate, Inc.*, 255 Kan. 593, Syl. ¶ 2, 876 P.2d 609 (1994), where our Supreme Court adopted the definition from the Restatement (Second) of Torts § 552 (1976). The Restatement (Second) of Torts § 552 defines negligent misrepresentation as follows:

" '(1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.' " 255 Kan. at 604.

Thus, by its own terms, the tort of negligent misrepresentation under Restatement (Second) of Tort § 552 imposes liability only for false information supplied to others.

The major difference between the torts of fraudulent misrepresentation and negligent misrepresentation is that fraudulent misrepresentation requires proof that the defendant knew the statement was untrue or was reckless as to the truth or falsity of the statement, while negligent misrepresentation requires proof that the defendant failed to exercise reasonable care or competence to

obtain or communicate true information. *Gerhardt v. Harris*, 261 Kan. 1007, 1018, 934 P.2d 976 (1997).

Based on a liberal construction of the Kunzles' counterclaim pleading, it appears that the Kunzles are alleging that the Brennans provided "false information" in the disclosure statement relating to the water leak condition and also when Derek Brennan told Christian Kunzle on May 30, 2001, that there were no problems with the house other than those described in the disclosure statement.

Based on the analysis of the previous issue, it appears that Kunzles' negligent misrepresentation claim also must fail. The buyers' acknowledgment contained clear language that the Kunzles needed to indicate any representations upon which they were relying. Because the Kunzles did not indicate any representations upon which they were relying, they have waived their right to rely on the Brennans' statements in the disclosure statement and those made before the disclosure statement was signed.

*Negligence*

In their 47-page appellate brief, the Kunzles make a one-paragraph argument that summary judgment was improper on their negligence counterclaim. The Kunzles contend that the Brennans were, in effect, the contractors in the construction of the house and could be held responsible for the defective construction of the residence.

The Kunzles provide no relevant legal authority and simply make a conclusory argument. Supreme Court Rule 6.02(e) (2006 Kan. Ct. R. Annot. 36) requires that an appellant's brief include "[t]he arguments and authorities relied upon." Further, our Supreme Court has stated that "[s]imply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue. 'Where the appellant fails to brief an issue, that issue is waived or abandoned. [Citation omitted.]' " *McCain Foods USA, Inc. v. Central Processors, Inc.*, 275 Kan. 1, 15, 61 P.3d 68 (2002) (quoting *Bergstrom v. Noah*, 266 Kan. 847, 873, 974 P.2d 531 [1999]); see also *State v. Haney*, 34 Kan. App. 2d 232, 248, 116 P.3d 747, *rev. denied* 280

Kan. 987 (2005) (Generally, an issue raised but not argued is deemed abandoned.). As a result, it is unnecessary to address this issue any further.

Moreover, it appears that the trial court properly determined that the Kunzles could not establish the duty element of negligence in this case. In count II of their counterclaims, the Kunzles alleged that the Brennans had a duty to exercise care in the design and construction of the house and in the repairs they made to the house before it was sold and that the Brennans breached these duties. Nevertheless, the trial court found that the Brennans had no such duty in this case. The trial court pointed out that the Brennans did not construct the house or perform repairs to the house. Rather, they hired independent contractors to perform this work. The trial court noted that the Brennans were not experts in the design, construction, or repair of homes. Moreover, they were not in the business of construction or of selling homes. Citing *Falls v. Scott*, 249 Kan. 54, 815 P.2d 1104 (1991), the trial court stated that an owner hiring contractors to perform work or services does not make the owner liable for negligence of the contractor. Because the Kunzles could not establish the duty element of their negligence counterclaim, the trial court properly granted summary judgment to the Brennans.

*Breach of Implied Warranties*

Again, the Kunzles make a one-paragraph argument in their appellate brief that summary judgment should not have been granted on their breach of implied warranties counterclaim. In granting summary judgment, the trial court pointed out that the disclosure statement in the real estate contract stated that the property was being sold "without warranties or guaranties of any kind by SELLER or BROKER(S) or agents concerning the condition or value of the property." In addition, citing *Miles v. Love*, 1 Kan. App. 2d 630, 573 P.2d 622, *rev. denied* 225 Kan. 845 (1977), the trial court found that an implied warranty to build a house or to perform other work in a "good and workmanlike manner" only applied to contractors and those in the business of selling services or contracting to provide work and did not apply to ordinary per-

sons who were merely selling their personal residence to other ordinary persons. As with the previous issue, the Kunzles provide no legal authority and simply make a conclusory argument as to why the trial court's decision was in error. Therefore, it is unnecessary to address this issue any further.

*"As Is" Clause*

Finally, the trial court determined that the Kunzles "agreed to accept the house 'as is' following their opportunity to inspect and after their list of repair items in 'Addendum A' to the Amendment in the sale contract were resolved to their satisfaction. The Brennans argue that the Kunzles agreed to accept the property "as is." Nevertheless, an "as is" clause is not a defense to fraud. See *Alires*, 277 Kan. at 409. Moreover, this conclusion is consistent with the majority view: an "as is" clause in a real estate contract does not shield a seller from liability for fraud. 277 Kan. at 409; see also *S Dev. Co. v. Pima Capital Mgmt. Co.*, 201 Ariz. 10, 16, 31 P.3d 123 (2001) ("[A] vendor *must* disclose *latent* defects in property that are known to the vendor, notwithstanding the existence of a burden-shifting 'as is' clause or disclaimer of warranties."); *Stemple v. Dobson*, 184 W.Va. 317, 323, 400 S.E.2d 561 (1990) (An "as is" clause in a real estate sale contract will not relieve the vendor of his or her obligation to disclose a condition that substantially affects the value or habitability of the property, is known to the vendor but not to the purchaser, and would not be disclosed by a reasonable and diligent inspection. Such failure to disclose constitutes fraud.).

*Should judgment have been entered on the Brennans' mortgage foreclosure claim?*

Finally, the Kunzles argue that the trial court erred in entering a judgment in favor of the Brennans on their mortgage foreclosure claim. The Kunzles maintain that the Brennans should not have been allowed to proceed with their foreclosure action until the Kunzles' counterclaims of fraud and misrepresentation had been resolved.

As the Brennans point out, the Kunzles provide no relevant authority for their argument. Our Supreme Court has stated that "[s]imply pressing a point without pertinent authority, or without showing why it is sound despite a lack of supporting authority, is akin to failing to brief an issue. 'Where the appellant fails to brief an issue, that issue is waived or abandoned. [Citation omitted.]' " *McCain*, 275 Kan. at 15 (quoting *Bergstrom*, 266 Kan. at 873).

Moreover, it is apparent that the trial court was well within its authority to enter a judgment on the Brennans' mortgage foreclosure claim. The trial court has the authority to order separate trials on any claim and counterclaim. See K.S.A. 60-213(j); K.S.A. 60-242(b); *Hindman v. Shepard*, 205 Kan. 207, 216, 468 P.2d 103 (1970), *cert. denied* 401 U.S. 928 (1971). Here, the Kunzles' counterclaims do not provide a defense to the Brennans' mortgage foreclosure action and would not affect the validity of the mortgage and promissory note. The Kunzles' counterclaims did not relate to the creation or the inception of the mortgage or promissory note. At most, if the Kunzles prevail on their counterclaim of fraud by silence, they could receive an offset against the amount they still owe to the Brennans.

## CROSS-APPEAL

*Did the trial court err in denying the Brennans attorney fees to defend the counterclaims?*

In their cross-appeal, the Brennans argue that the trial court erred in ruling that the parties did not agree to reimbursement for attorney fees regarding the counterclaims. The Brennans' argument requires interpretation of the promissory note and mortgage. The interpretation and legal effect of written instruments are matters of law over which an appellate court exercises unlimited review. Regardless of the construction given a written instrument by the trial court, an appellate court may construe a written instrument and determine its legal effect. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001).

"Attorney fees cannot be granted absent statutory authority or an agreement by the parties. A trial court does not have authority to impose attorney fees under its equitable powers absent statutory

authority. [Citation omitted.]" *Rensenhouse v. Bauer*, 33 Kan. App. 2d 148, 150, 98 P.3d 668 (2004). Where the trial court has authority to grant attorney fees, its decision is reviewed under the abuse of discretion standard. *Tyler v. Employers Mut. Cas. Co.*, 274 Kan. 227, 242, 49 P.3d 511 (2002).

Paragraph 6(E) of the promissory note allows for the recovery of attorney fees as follows:

"If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys fees."

Paragraph 19 of the mortgage document entitles the Brennans "to collect all expenses incurred in pursuing the remedies provided in this paragraph 19, including, but not limited to, reasonable attorneys' fees . . . ."

In awarding attorney fees to the Brennans, the trial court stated that "[t]he promissory note and mortgage in question do provide for recovery of attorney's fees, but they do not provide for the recovery of attorney's fees incurred in defending the Counterclaims asserted by the [Kunzles]." The trial court awarded the Brennans $2,500 in attorney fees and expenses for the foreclosure of their mortgage.

In arguing that the trial court should have awarded attorney fees incurred in defending the counterclaims, the Brennans cite to the real estate contract that provides for attorney fees when there has been a default under the contract. The Kunzles point out, however, that the real estate contract was never used as a basis for recovery of attorney fees in the trial court. Indeed, at the hearing before the trial court on this issue, the Brennans argued that they were entitled to attorney fees under the promissory note. They never argued that they could recover attorney fees under the real estate sale contract. Because the Brennans failed to argue this point before the trial court, it is unnecessary to address whether they are entitled to attorney fees under the real estate contract. See *Board of Lincoln County Comm'rs v. Nielander*, 275 Kan. 257, 268, 62 P.3d 247 (2003).

Moreover, under the doctrine of merger, the real estate contract would have merged into the deed or final contract of sale. Citing *Blair Constr., Inc. v. McBeth*, 273 Kan. 679, 686, 44 P.3d 1244 (2002), this court in *Schlup v. Bourdon*, 33 Kan. App. 2d 564, 571, 105 P.3d 720 (2005), set forth the doctrine of merger as follows:

" 'It is a general rule of law applicable to all contracts, including deeds, that prior stipulations and agreements are merged into the final and formal contract or deed executed by the parties. When a deed is delivered and accepted as performance of a contract to convey, the contract is presumed to be merged into the deed. [Citations omitted.]' "

When the deed or final contract does not contain a provision included in a prior agreement, the presumption is that the provision was waived or superseded by the final contract. 33 Kan. App. 2d at 571. It appears that the default provision in the real estate contract would have been superseded or merged into the deed executed by the parties.

Nevertheless, as they argued before the trial court, the Brennans maintain that they are entitled to recover attorney fees for defending the counterclaims based on the language in the promissory note. The promissory note allows the Brennans to recover reasonable attorney fees "in enforcing" the note "to the extent not prohibited by applicable law." Moreover, the mortgage document allows the Brennans to collect reasonable attorney fees in foreclosing the mortgage. This language allows the Brennans to recover attorney fees in enforcing the promissory note and in foreclosing the mortgage but does not allow for attorney fees in defending counterclaims asserted by the Kunzles.

Citing *DeSpiegelaere v. Killion*, 24 Kan. App. 2d 542, 947 P.2d 1039 (1997), the Brennans argue that the attorney fees incurred in defending the counterclaims were recoverable because they were integral to pursuing the mortgage foreclosure action. In *DeSpiegelaere*, this court stated:

"An exception to the duty of a prevailing party's attorney to segregate work on several causes of action arises when the attorney fees rendered are in connection with claims arising out of the same transaction and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts. Therefore, when the causes of action involved in the suit are dependent upon the same

set of facts or circumstances and, thus, are intertwined to the point of being inseparable, the party suing for attorney fees may recover the entire amount covering all claims." 24 Kan. App. 2d 542, Syl. ¶ 2.

Here, the Brennans' mortgage foreclosure action and the Kunzles' counterclaims did not entail "proof or denial of essentially the same facts" and were not "intertwined to the point of being inseparable." The mortgage foreclosure action involved the Kunzles' failure to pay on the promissory note and mortgage while the Kunzles' counterclaims concerned the Brennans' misrepresentations and failure to disclose information prior to the closing on the house. The parties' claims required proof of entirely separate facts. Thus, the rule in *DeSpiegelaere* does not have application to this case.

*Did the trial court properly award interest under the promissory note and mortgage?*

Finally, the Brennans contend that the trial court erred in determining that the interest rate on default should fluctuate monthly based on the statutory rate published by the Secretary of State under K.S.A. 2006 Supp. 16-207. The Brennans' argument requires interpretation of the promissory note and mortgage over which we exercise unlimited review. See *Unrau*, 271 Kan. at 763.

The promissory note contains the following provision on interest:

"The first six months of the note shall be interest free, thereafter, interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate of 7%. The annual interest rate upon maturity on the unpaid principal will be at the highest allowable by law."

The "maturity date" under the promissory note was August 3, 2002. As the Brennans point out, K.S.A. 2006 Supp. 16-207(b) establishes the maximum interest rate that may be charged for notes secured by real estate and that statutory rate is published monthly by the Secretary of State.

The trial court awarded interest on the note beginning August 2002 based on a fluctuating monthly interest rate. From August 2002, the trial court recalculated interest each month based on the new interest rate published monthly by the Secretary of State.

The Brennans argue that the interest rate published by the Secretary of State that was in effect on August 3, 2002, should be the

interest rate payable on the unpaid principal balance until it is paid in full. The Brennans' argument is correct. The promissory note states that "[t]he annual interest rate *upon maturity* on the unpaid principal will be at the highest allowable by law." (Emphasis added.) The language "upon maturity" sets the date at which the interest rate would be determined. Here, that date was August 3, 2002. The parties inform us that the interest rate that was "the highest allowable by law" on that date was 7.93%. The 7.93% fixed rate should be the interest rate on the unpaid principal balance until it has been paid in full.

Moreover, the Brennans point out that K.S.A. 2006 Supp. 16-207(h) states that subsection (b), which sets forth the maximum interest rate that may be charged for notes secured by real estate and provides that the rate is published monthly by the Secretary of State, does not apply to real estate notes with adjustable rates. As the Brennans point out, it would be illogical that a default interest rate for a fixed-rate note would fluctuate.

Based upon the language in the promissory note, the applicable interest rate should have been determined upon maturity and not redetermined each month based on the new statutory rate published monthly by the Secretary of State. Therefore, the trial court's award of interest is reversed, and the case is remanded for the trial court to recalculate interest based on a 7.93% fixed interest rate from the date of maturity.

In summary, we affirm the grant of summary judgment on the Kunzles' counterclaims of negligent misrepresentation, negligence, and breach of implied warranties. We reverse the trial court's grant of summary judgment on the Kunzles' counterclaim of fraud by silence. We affirm the mortgage foreclosure and the award of attorney fees to the Brennans. We reverse the award of interest and remand the case with directions for the trial court to recalculate interest at the fixed rate of 7.93% from the date of maturity.

Affirmed in part, reversed in part, and remanded for trial; reversed in part and remanded in part with directions.